**[ORAL ARGUMENT NOT SCHEDULED]**

**No. 25-5314**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

————————————

MICHAEL ABRAMOWITZ, *et al.*,

Plaintiffs-Appellees,

v.

KARI LAKE, *et al.*,

Defendants-Appellants.

————————————

**APPELLANTS' BRIEF**

————————————

BRETT A. SHUMATE
 *Assistant Attorney General*

YAAKOV M. ROTH
 *Principal Deputy Assistant
  Attorney General*

ELIZABETH HEDGES
JOHN BAILEY
ABIGAIL STOUT
 *Civil Division
 U.S. Department of Justice
 950 Pennsylvania Avenue NW
 Washington, DC 20530
 (771) 209-1978
 Elizabeth.T.Hedges@usdoj.gov*

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

### A.    Parties

Plaintiffs are Michael Abramowitz, in his official capacity as Director of Voice of America; Anthony Michael Labruto; and J. Doe 2.[1] Defendants are Kari Lake, in her official capacity as (at the time of the complaint's filing) Senior Advisor to the Acting CEO of the U.S. Agency for Global Media; Victor Morales, in his official capacity as (at the time of filing) Acting CEO of the U.S. Agency for Global Media; and the U.S. Agency for Global Media. Reporters Committee for Freedom of the Press and Former U.S. Foreign Policy and National Security Officials and Other Experts on Public Diplomacy both moved for leave to file amicus briefs.

### B.    Rulings Under Review

Defendants-Appellants have appealed the memorandum opinion and order granting Plaintiffs' motion for partial summary judgment in *Abramowitz v. Lake*, No. 25-887 (D.D.C.). The opinion and order are included in the Joint Appendix. *See* JA81-104.  This appeal seeks reversal of the summary-judgment decision encapsulated in the opinion and order.

---

[1] J. Doe 1 voluntarily dismissed his claims. Dkt. No. 12 (Notice of Dismissal).

### C.     Related Cases

This case was considered by this Court in an earlier appeal. *Abramowitz v. Lake*, No. 25-887 (D.D.C.), *appeal pending*, No. 25-5145 (D.C. Cir.), *stay granted*, 2025 WL 1288817 (D.C. Cir. May 3, 2025). Five related cases are currently pending:

- *RFE/RL, Inc. v. Lake*, No. 25-799 (D.D.C.), *stay granted*, No. 25-5158, 2025 WL 1453770 (D.C. Cir. May 7, 2025), *appeal dismissed*, 2025 WL 1839924 (D.C. Cir. July 1, 2025)

- *Open Technology Fund v. Lake*, No. 25-840 (D.D.C.)

- *Middle East Broadcasting Networks, Inc. v. Lake*, No. 25-966 (D.D.C.), *appeal pending*, No. 25-5150 (D.C. Cir), *stay granted*, 2025 WL 1288817 (D.C. Cir. May 3, 2025)

- *Radio Free Asia v. Lake*, No. 25-907 (D.D.C.), *appeal pending*, No. 25-5151 (D.C. Cir.), *stay granted*, 2025 WL 1288817 (D.C. Cir. May 3, 2025)

- *Widakuswara v. Lake*, No. 25-1015 (D.D.C.), *appeal pending*, No. 25-5144 (D.C. Cir.), *stay granted*, 2025 WL 1288817 (D.C. Cir. May 3, 2025)

*/s/ Elizabeth Hedges*
Elizabeth Hedges

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .......... i

    A.    Parties .................................................................................. i

    B.    Rulings Under Review ........................................................ i

    C.    Related Cases ..................................................................... ii

TABLE OF CONTENTS ....................................................................... iii

TABLE OF AUTHORITIES ................................................................... v

GLOSSARY ........................................................................................... x

INTRODUCTION .................................................................................. 1

STATEMENT OF JURISDICTION ....................................................... 2

STATEMENT OF THE ISSUES ............................................................ 2

PERTINENT STATUTES AND REGULATIONS ................................. 3

STATEMENT OF THE CASE ............................................................... 13

    I.    Background ......................................................................... 13

        A.  The Voice Of America Program And Its Leadership ............ 13

        B.  The Advisory Board ........................................................ 15

        C.  Executive Order 14,238 And Its Implementation ................ 16

    II.    This Litigation ................................................................... 16

SUMMARY OF ARGUMENT .............................................................. 20

STANDARD OF REVIEW .................................................................... 21

ARGUMENT .......................................................................................... 21

I.    The CSRA Requires Channeling This Employment
      Dispute. ........................................................................22

II.   The Removal Restrictions In § 6205(e) Are
      Unconstitutional. ........................................................32

III.  Courts Lack The Power To Issue Equitable Relief
      Restoring A Removed Executive Officer. ...................37

CONCLUSION ................................................................. 44

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*,
929 F.3d 748 (D.C. Cir. 2019) ............................................. 22, 23, 24, 27, 28, 31

*Atlas Air, Inc., v. Int'l Bhd. of Teamsters*,
928 F.3d 1102 (D.C. Cir. 2019) ...........................................................21

*Axon Enter., Inc. v. FTC*,
598 U.S. 175 (2023) ........................................................................ 29, 30

*Baker v. Carr*,
369 U.S. 186 (1962) .................................................................................40

*Bessent v. Dellinger*,
145 S. Ct. 515 (2025) ..............................................................................41

*Dellinger v. Bessent*,
No. 25-5028, 2025 WL 559669 (D.C. Cir. Feb. 15, 2025) ................... 38, 40, 42

*District of Columbia v. Exxon Mobil Corp.*,
89 F.4th 144 (D.C. Cir. 2023) ...............................................................25

*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006) ...............................................................................38

*Elgin v. Dep't of Treasury*,
567 U.S. 1 (2012) ............................................................ 23, 24, 25, 26, 28, 30

*Fam. Tr. of Mass., Inc. v. United States*,
722 F.3d 355 (D.C. Cir. 2013) ...............................................................21

*Fornaro v. James*,
416 F.3d 63 (D.C. Cir. 2005) ..................................................................43

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) .......................................................................... 39, 43

v

*Free Enterprise Fund v. PCAOB,*
    561 U.S. 477 (2010) ....................................................... 32, 33, 34, 35, 36

*Grosdidier v. Chairman, Broad. Bd. of Governors,*
    709 F.3d 19 (D.C. Cir. 2013) ....................................................24

*Harris v. Bessent,*
    No. 25-5037, 2025 WL 1021435 (D.C. Cir. Apr. 7, 2025) (en banc) .............42

*Hecht Co. v. Bowles,*
    321 U.S. 321 (1944) ....................................................43

*Humphrey's Executor v. United States,*
    295 U.S. 602 (1935) ....................................................39

*In re Sawyer,*
    124 U.S. 200 (1888) ....................................................40

*Jolley v. United States,*
    549 F. Supp. 3d 1 (D.D.C. 2021) ....................................................31

*Kennedy v. Braidwood Mgmt., Inc.,*
    145 S. Ct. 2427 (2025) ....................................................... 32, 43

*Morrison v. Olson,*
    487 U.S. 654 (1988) ....................................................33

*Myers v. United States,*
    272 U.S. 52 (1926) ....................................................39

*N.M. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.,*
    148 F.4th 755 (D.C. Cir. 2025) ....................................................21

*Parsons v. United States,*
    167 U.S. 324 (1897) ....................................................39

*Raines v. Byrd,*
    521 U.S. 811 (1997) ....................................................42

*Seila Law LLC v. CFPB,*
    591 U.S. 197 (2020) ....................................................... 34, 35, 36

vi

*Shurtleff v. United States*,
 189 U.S. 311 (1903) ...................................................................................39

*Trump v. CASA, Inc.*,
 606 U.S. 831 (2025) .......................................................................... 38, 43

*Trump v. Wilcox*,
 145 S. Ct. 1415 (2025) ...................................................................... 34, 42

*United States v. Fausto*,
 484 U.S. 439 (1988) ...................................................................................44

*Walton v. House of Representatives*,
 265 U.S. 487 (1924) ...................................................................................40

*White v. Berry*,
 171 U.S. 366 (1898) .......................................................................... 40, 42

*Widakuswara v. Lake*,
 No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025) .......... ii, 1, 16, 17, 22

*Widakuswara v. Lake*,
 Nos. 25-5144, 25-5145, 2025 WL 1556440 (D.C. Cir. May 22, 2025) ............17

*Widakuswara v. Lake*,
 Nos. 25-5144, 25-5145, 25-5150, 25-5151,
 2025 WL 1521355 (D.C. Cir. May 28, 2025) ...................................................17

*Wiener v. United States*,
 357 U.S. 349 (1958) ...................................................................................39

**Statutes**

5 U.S.C. § 104............................................................................................33

5 U.S.C. § 1204(a) .....................................................................................22

5 U.S.C. § 1214............................................................................................22

22 U.S.C. § 6201(4) ........................................................................................14

22 U.S.C. § 6202(b) ........................................................................................13

22 U.S.C. § 6202(c) .................................................................................. 13, 14

22 U.S.C. § 6203(b)(1) ........................................................................ 13, 32, 33

22 U.S.C. § 6204 ............................................................................................13

22 U.S.C. § 6204(a)(1) ....................................................................................13

22 U.S.C. § 6204(a)(2) ....................................................................................13

22 U.S.C. § 6204(a)(8) ....................................................................................13

22 U.S.C. § 6205(a) .................................................................................. 15, 33

22 U.S.C. § 6205(b)(1) ....................................................................................15

22 U.S.C. § 6205(b)(3) .............................................................................. 15, 37

22 U.S.C. § 6205(e) ............................................... 2, 18, 20, 21, 29, 32, 37

22 U.S.C. § 6205(e)(1) ....................................................................................15

22 U.S.C. § 6205(e)(3) .............................................................................. 15, 37

22 U.S.C. § 6205(e)(3)(A) ..............................................................................15

22 U.S.C. § 6205(e)(3)(B) ..............................................................................15

22 U.S.C. § 6208 ............................................................................................13

28 U.S.C. § 1292(a)(1) .....................................................................................2

## Regulatory Materials

Exec. Order No. 14,238, 90 Fed. Reg. 13043 (Mar. 14, 2025) ..........................16

**Rules**

Fed. R. Evid. 201(b)(2) ........................................................................31

Fed. R. Evid. 201(d) ...........................................................................31

**Treatises**

2 James L. High, *Treatise on the Law of Injunctions* § 1312 (2d ed. 1880) ........41

**Constitutional Provisions**

U.S. Const. Art. II, § 2, cl. 2 ................................................... 32, 33

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| CSRA | Civil Service Reform Act |
| JA | Joint Appendix |
| MSPB | Merit Systems Protection Board |
| PCAOB | Public Company Accounting Oversight Board |
| OSC | Office of Special Counsel |
| USAGM | U.S. Agency for Global Media |
| VOA | Voice of America |

x

## INTRODUCTION

This litigation has already generated employment-related injunctions that this Court stayed pending appeal. *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025). The district court has issued another such injunction, permanently blocking the government from removing the Director of Voice of America ("VOA"). That injunction is just as flawed as the one previously stayed. This Court should reverse.

For each of three independent reasons, the district court erred in issuing a permanent injunction against the VOA Director's removal. As in *Widakuswara*, the district court lacked jurisdiction over this employment dispute because the Director brought his claim in the wrong forum. The Civil Service Reform Act channels such claims to an agency adjudicator such as the Merit Systems Protection Board ("MSPB"). Additionally, the statutory removal restrictions applicable to the Director are unconstitutional under Article II. Lastly, reinstatement of a federal officer is an ahistorical remedy that exceeds an Article III court's limited powers.

Each of these errors independently justifies reversal. And although a panel of this Court declined to issue a stay pending appeal of the district court's ruling, it did so because it found the government had not

demonstrated that irreparable harm would result absent the stay.  The Court did not address any of the merits arguments presented here.  The Court should consider these merits arguments afresh and reverse.

## STATEMENT OF JURISDICTION

Although the district court lacked jurisdiction over this dispute under the Civil Service Reform Act ("CSRA"), it determined that it had jurisdiction (albeit without specifying the statutory basis).  JA95.  This Court has jurisdiction over the appeal under 28 U.S.C. § 1292(a)(1) because the district court entered an injunction against Mr. Abramowitz's removal.  JA104; JA81.

## STATEMENT OF THE ISSUES

I.    Whether the Civil Service Reform Act channels this employment dispute to the Merit Systems Protection Board or Office of Special Counsel, depriving the district court of jurisdiction in this case.

II.   Whether 22 U.S.C. § 6205(e)'s restrictions on the removal of the Voice of America Director violate Article II of the United States Constitution.

III.  Whether the district court exceeded its authority when it enjoined the Voice of America Director's removal, a remedy equivalent to reinstatement.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes are reproduced here.

## 5 U.S.C. § 104

For the purpose of this title, "independent establishment" means--

**(1)** an establishment in the executive branch (other than the United States Postal Service or the Postal Regulatory Commission) which is not an Executive department, military department, Government corporation, or part thereof, or part of an independent establishment . . . .

. . .

## 5 U.S.C. § 1204

**(a)** The Merit Systems Protection Board shall--

**(1)** hear, adjudicate, or provide for the hearing or adjudication, of all matters within the jurisdiction of the Board under this title, chapter 43 of title 38, or any other law, rule, or regulation, and, subject to otherwise applicable provisions of law, take final action on any such matter;

**(2)** order any Federal agency or employee to comply with any order or decision issued by the Board under the authority granted under paragraph (1) of this subsection and enforce compliance with any such order[.]

. . .

. . .

## 5 U.S.C. § 1214

**(a)(1)(A)** The Special Counsel shall receive any allegation of a prohibited personnel practice and shall investigate the allegation to the extent necessary to determine whether there are reasonable grounds to believe that a prohibited personnel practice has occurred, exists, or is to be taken.

. . .

**(3)** Except in a case in which an employee, former employee, or applicant for employment has the right to appeal directly to the Merit Systems Protection Board under any law, rule, or regulation, any such employee, former employee, or applicant shall seek corrective action from the Special Counsel before seeking corrective action from the Board. An employee, former employee, or applicant for employment may seek corrective action from the Board under section 1221, if such employee, former employee, or applicant seeks corrective action for a prohibited personnel practice described in section 2302(b)(8) or section 2302(b)(9)(A)(i), (B), (C), or (D) from the Special Counsel and--

> **(A)(i)** the Special Counsel notifies such employee, former employee, or applicant that an investigation concerning such employee, former employee, or applicant has been terminated; and
>
> **(ii)** no more than 60 days have elapsed since notification was provided to such employee, former employee, or applicant for employment that such investigation was terminated; or
>
> **(B)** 120 days after seeking corrective action from the Special Counsel, such employee, former employee, or applicant has not been notified by the Special Counsel that the Special Counsel shall seek corrective action on behalf of such employee, former employee, or applicant.

. . .

**(b)(1)(A)(i)** The Special Counsel may request any member of the Merit Systems Protection Board to order a stay of any personnel action for 45 days

4

if the Special Counsel determines that there are reasonable grounds to believe that the personnel action was taken, or is to be taken, as a result of a prohibited personnel practice.

. . .

**(2)(A)(i)** Except as provided under clause (ii), no later than 240 days after the date of receiving an allegation of a prohibited personnel practice under paragraph (1), the Special Counsel shall make a determination whether there are reasonable grounds to believe that a prohibited personnel practice has occurred, exists, or is to be taken.

**(ii)** If the Special Counsel is unable to make the required determination within the 240-day period specified under clause (i) and the person submitting the allegation of a prohibited personnel practice agrees to an extension of time, the determination shall be made within such additional period of time as shall be agreed upon between the Special Counsel and the person submitting the allegation.

**(B)** If, in connection with any investigation, the Special Counsel determines that there are reasonable grounds to believe that a prohibited personnel practice has occurred, exists, or is to be taken which requires corrective action, the Special Counsel shall report the determination together with any findings or recommendations to the Board, the agency involved and to the Office of Personnel Management, and may report such determination, findings and recommendations to the President. The Special Counsel may include in the report recommendations for corrective action to be taken.

**(C)** If, after a reasonable period of time, the agency does not act to correct the prohibited personnel practice, the Special Counsel may petition the Board for corrective action.

. . .

**(4)(A)** The Board shall order such corrective action as the Board considers appropriate, if the Board determines that the Special Counsel has demonstrated that a prohibited personnel practice, other than one described

5

in section 2302(b)(8) or section 2302(b)(9)(A)(i), (B), (C), or (D), has occurred, exists, or is to be taken.

**(B)(i)** Subject to the provisions of clause (ii), in any case involving an alleged prohibited personnel practice as described under section 2302(b)(8) or section 2302(b)(9)(A)(i), (B), (C), or (D), the Board shall order such corrective action as the Board considers appropriate if the Special Counsel has demonstrated that a disclosure or protected activity described under section 2302(b)(8) or section 2302(b)(9)(A)(i), (B), (C), or (D) was a contributing factor in the personnel action which was taken or is to be taken against the individual.

. . .

**(c)(1)** Judicial review of any final order or decision of the Board under this section may be obtained by any employee, former employee, or applicant for employment adversely affected by such order or decision.

. . .

**(g)** If the Board orders corrective action under this section, such corrective action may include—

    **(1)** that the individual be placed, as nearly as possible, in the position the individual would have been in had the prohibited personnel practice not occurred; and

    **(2)** reimbursement for attorney's fees, back pay and related benefits, medical costs incurred, travel expenses, any other reasonable and foreseeable consequential damages, and compensatory damages (including interest, reasonable expert witness fees, and costs).

. . .

## 22 U.S.C. § 6201

The Congress makes the following findings and declarations:

. . .

**(4)** The continuation of existing United States international broadcasting, and the creation of a new broadcasting service to the people of the People's Republic of China and other countries of Asia which lack adequate sources of free information, would enhance the promotion of information and ideas, while advancing the goals of United States foreign policy.

. . .

**22 U.S.C. § 6202**

. . .

**(b) Broadcasting principles**

United States international broadcasting shall include—

**(1)** news which is consistently reliable and authoritative, accurate, objective, and comprehensive;

**(2)** a balanced and comprehensive projection of United States thought and institutions, reflecting the diversity of United States culture and society;

**(3)** clear and effective presentation of the policies of the United States Government and responsible discussion and opinion on those policies, including editorials, broadcast by the Voice of America, which present the views of the United States Government;

**(4)** the capability to provide a surge capacity to support United States foreign policy objectives during crises abroad;

**(5)** programming to meet needs which remain unserved by the totality of media voices available to the people of certain nations;

**(6)** information about developments in each significant region of the world;

**(7)** a variety of opinions and voices from within particular nations and regions prevented by censorship or repression from speaking to their fellow countrymen;

**(8)** reliable research capacity to meet the criteria under this section;

**(9)** adequate transmitter and relay capacity to support the activities described in this section; and

**(10)** training and technical support for independent indigenous media through government agencies or private United States entities.

## (c) Voice of America broadcasts

The long-range interests of the United States are served by communicating directly with the peoples of the world by radio. To be effective, the Voice of America must win the attention and respect of listeners. These principles will therefore govern Voice of America (VOA) broadcasts:

**(1)** VOA will serve as a consistently reliable and authoritative source of news. VOA news will be accurate, objective, and comprehensive.

**(2)** VOA will represent America, not any single segment of American society, and will therefore present a balanced and comprehensive projection of significant American thought and institutions.

**(3)** VOA will present the policies of the United States clearly and effectively, and will also present responsible discussions and opinion on these policies.

**22 U.S.C. § 6203**

. . .

**(b) Chief Executive Officer**

**(1) In general**

The head of the United States Agency for Global Media shall be a Chief Executive Officer, who shall be appointed by the President, by and with the advice and consent of the Senate. Notwithstanding any other provision of law, until such time as a Chief Executive Officer is appointed and has qualified, the current or acting Chief Executive Officer appointed by the Board may continue to serve and exercise the authorities and powers under this chapter.

. . .

. . .

**22 U.S.C. § 6204**

**(a) Authorities**

The Chief Executive Officer shall have the following authorities:

**(1)** To supervise all broadcasting activities conducted pursuant to this chapter, the Radio Broadcasting to Cuba Act,,[1] the Television Broadcasting to Cuba Act, and Worldnet Television, except as provided in section 6205(b) of this title.

**(2)** To review and evaluate the mission and operation of, and to assess the quality, effectiveness, and professional integrity of, all such activities within the context of the broad foreign policy objectives of the United States.

. . .

9

**(8)** To undertake such studies as may be necessary to identify areas in which broadcasting activities under its authority could be made more efficient and economical.

. . .

. . .

**22 U.S.C. § 6205**

**(a) In general**

The International Broadcasting Advisory Board (referred to in this section as the "Advisory Board") shall advise the Chief Executive Officer of the United States Agency for Global Media, as appropriate. The Advisory Board as established shall exist within the executive branch as an entity described in section 104 of Title 5.

**(b) Composition of the Advisory Board**

**(1) In general**

The Advisory Board shall consist of seven members, of whom--

**(A)** six shall be appointed by the President, by and with the advice and consent of the Senate, in accordance with subsection (c); and

**(B)** one shall be the Secretary of State.

. . .

**(3) Party limitation**

Not more than three members of the Advisory Board appointed under paragraph (1)(A) may be affiliated with the same political party.

. . .

. . .

**(e) Appointment of heads of networks**

**(1) In general**

The heads of Voice of America, the Office of Cuba Broadcasting, RFE/RL, Inc., Radio Free Asia, the Middle East Broadcasting Networks, the Open Technology Fund, or of any other grantee authorized under this chapter may only be appointed or removed if such action has been approved by a majority vote of the Advisory Board.

**(2) Removal**

After consulting with the Chief Executive Officer, five or more members of the Advisory Board may unilaterally remove any such head of network or grantee network described in paragraph (1).

**(3) Quorum**

**(A) In general**

A quorum shall consist of four members of the Advisory Board (excluding the Secretary of State).

**(B) Decisions**

Except as provided in paragraph (2), decisions of the Advisory Board shall be made by majority vote, a quorum being present.

. . .

. . .

11

**22 U.S.C. § 6208**

. . .

**(f) Notification and consultation regarding displacement of Voice of America broadcasting**

**(1) Notification**

The Agency shall notify the appropriate congressional committees before--

**(A)** entering into any agreements for the utilization of Voice of America transmitters, equipment, or other resources that will significantly reduce the broadcasting activities of the Voice of America in Asia or any other region in order to accommodate the broadcasting activities of Radio Free Asia; or

**(B)** entering into any agreements in regard to the utilization of Radio Free Asia transmitters, equipment, or other resources that will significantly reduce the broadcasting activities of Radio Free Asia.

**(2) Consultation**

The Chief Executive Officer of the Agency shall consult with such committees on the impact of any such reduction in Voice of America broadcasting activities or Radio Free Asia broadcasting activities.

. . .

12

**STATEMENT OF THE CASE**

## I.   Background

*A. The Voice Of America Program And Its Leadership*

The International Broadcasting Act of 1994 (the "Act") tasks the U.S. Agency for Global Media ("USAGM" or the "Agency") with overseeing multiple entities and programs, including Voice of America ("VOA"). 22 U.S.C. §§ 6202(c), 6204, 6208. By statute, the Agency's "head" is its "Chief Executive Officer" ("CEO"). *Id.* § 6203(b)(1). The CEO has authority to "supervise all broadcasting activities conducted" by entities overseen by the Agency; to "review and evaluate the mission and operation of, and to assess the quality, effectiveness, and professional integrity of, all such [entities'] activities within the context of the broad foreign policy objectives of the United States"; and "[t]o undertake such studies as may be necessary to identify areas in which broadcasting activities under its authority could be made more efficient and economical." *Id.* § 6204(a)(1), (a)(2), (a)(8).

The VOA program is designed to pursue the missions of "present[ing] the views of the United States Government"; "represent[ing] America"; and "present[ing] the policies of the United States clearly and effectively." *Id.* § 6202(b), (c). The Act states that its purpose is to "advanc[e] the goals of

13

United States foreign policy" through international broadcasting. *Id.* § 6201(4). VOA is also charged with serving the "long-range interests of the United States" "by communicating directly with the peoples of the world"; "win[ning] the attention and respect of listeners"; and providing an "accurate, objective, comprehensive," and "authoritative" source of news that "present[s] the policies of the United States clearly and effectively." *Id.* § 6202(c).

The head of VOA is the Director, who reports directly to the Agency's CEO.   JA77.   The Director exercises significant policymaking and administrative authority.  Among other responsibilities, the Director manages and has overall responsibility for VOA's global multimedia content and its administration.  JA74. This responsibility includes the planning, organization, and execution of all VOA operations, including ensuring that programming and operations are consistent with the Act's broadcasting standards and principles.  *Id.*  The Director enjoys a high degree of independence to meet strategic objectives and represents VOA inside and outside the Agency, with government and non-government entities, on topics like U.S. international media and the budget.  JA74-76.

14

B. *The Advisory Board*

The Agency's CEO is advised by an International Broadcasting Advisory Board ("Advisory Board").  22 U.S.C. § 6205(a).  The Advisory Board is a seven-member body consisting of the Secretary of State and six members appointed by the President and confirmed by the Senate.  *Id.* § 6205(b)(1).  Of the six appointed members, no more than three may belong to the same political party.  *Id.* § 6205(b)(3).  Four members of the Advisory Board are required for a quorum.  *Id.* § 6205(e)(3)(A).  And a "majority" must agree on any decision.  *Id.* § 6205(e)(3)(B).

Relevant here, Congress purported to limit the CEO's authority over the VOA Director by giving the Advisory Board power over the Director's appointment and removal. Specifically, in 2020, Congress amended the Act so that the "head[] of Voice of America . . . may only be appointed or removed if such action has been approved by a majority vote of the Advisory Board." *Id.* § 6205(e)(1). Congress did not, however, purport to limit the President's authority to remove Advisory Board members, and the Advisory Board currently lacks a quorum because its members (other than the *ex officio* Secretary of State) have been removed. Dkt. No. 59-2 ¶ 10 (Statement of Facts); Dkt. No. 65-3 ¶ 10 (Resp. to Statement of Facts).

15

### C. Executive Order 14,238 And Its Implementation

On March 14, 2025, the President issued Executive Order 14,238, which directed that the Agency's "non-statutory components and functions" be eliminated and that its "performance of [its] statutory functions and associated personnel" be reduced to "the minimum presence and function required by law." Exec. Order No. 14,238, 90 Fed. Reg. 13043 (Mar. 14, 2025). The Agency began implementing this order shortly thereafter, including by placing 1,042 employees on administrative leave with full pay and benefits. Dkt. No. 13-4 ¶ 6 (Declaration of Crystal Thomas).

## II.   This Litigation

1. In March, Michael Abramowitz—the VOA Director—and three other VOA employees sued the Agency; Kari Lake, in her official capacity as Senior Advisor to the Acting CEO of the Agency; and Victor Morales, in his official capacity as Acting CEO. JA1. Plaintiffs challenged the "dismantl[ing]" of VOA. JA4. On Plaintiffs' motion, the district court entered preliminary injunctive relief ordering the Agency to, *inter alia*, "restore its employees and contractors to their pre-March 14 status." *Widakuswara*, 2025 WL 1288817, at *1; Dkt. No. 29 (Preliminary-Injunction Order).

16

The government came to this Court for emergency relief. A panel granted the partial stay that the government requested. Relevant here, the Court held that the government was likely to succeed in arguing that the district court "lacked jurisdiction over the Agency's personnel actions" because disputes over those actions are channeled through "comprehensive statutory schemes." *Widakuswara*, 2025 WL 1288817, at *2. The Court also held that the balance of harms and public interest favored the stay. *Id.* at *5-6. Then, the en banc Court denied Plaintiffs' motion for reconsideration and vacatur of the stay in that respect. *Widakuswara v. Lake*, Nos. 25-5144, 25-5145, 2025 WL 1556440 (D.C. Cir. May 22, 2025); *Widakuswara v. Lake*, Nos. 25-5144, 25-5145, 25-5150, 25-5151, 2025 WL 1521355 (D.C. Cir. May 28, 2025).

2. At the time of the *Widakuswara* stay briefing, Mr. Abramowitz was on administrative leave. JA48. Months later, Mr. Abramowitz received a notice of reassignment, which warned that "declin[ing] to accept [the] reassignment" could "subject [Mr. Abramowitz] to removal under adverse action procedures pursuant to 5 U.S.C. § 7543." JA53. After he declined to accept the reassignment, Mr. Abramowitz received a notice of proposed removal. JA60. The notice informed him that he could "file an appeal of the decision on this Proposal with the U.S. Merit Systems Protection Board

17

('MSPB')" or "file a claim of prohibited personnel practices with the U.S. Office of Special Counsel ('OSC')."  JA65.

Instead of pursuing agency adjudication, Plaintiffs filed a motion for partial summary judgment in the district court.[2]  Dkt. No. 59.  They asked the district court to "enjoin Defendants from removing [Mr. Abramowitz] from his position as VOA director unless [Defendants] comply with 22 U.S.C. § 6205(e)." *Id.* at 21.  As the government explained in its Response in Opposition, Dkt. No. 65, the district court lacked jurisdiction over Mr. Abramowitz's employment dispute under the CSRA; § 6205(e)'s removal restrictions violate Article II; and the district court lacked authority to enjoin his removal in any event.  Yet the district court held that Mr. Abramowitz's removal without consent of the Advisory Board violated § 6205, and it granted the motion as to Count 1, Plaintiffs' claim for violation of the Administrative Procedure Act ("APA"). *See* JA81. Under the Order, the government is permanently enjoined "from removing Plaintiff Abramowitz from his position as director of Voice of America without the approval of a majority of the International Broadcasting Advisory Board." *Id.* In

---

[2] Plaintiffs did not amend their Complaint to add a claim based on Mr. Abramowitz's termination.

considering (and rejecting) the government's argument that the CSRA deprived the district court of jurisdiction, the court considered this Court's *Widakuswara* stay but did not believe that it controlled.  JA108.

3. The government appealed on August 29, 2025.  Dkt. No. 78.  Then, it moved for a stay pending appeal in the district court, which denied the motion because it held that Mr. Abramowitz's claim is not subject to channeling; the statutory removal restrictions do not violate Article II; and the equitable factors did not favor a stay.  JA105-11.

Next, the government moved this Court for a stay pending appeal. The panel denied the motion, reasoning that the government had not demonstrated it would suffer irreparable harm absent a stay because Mr. Abramowitz was on administrative leave, was "not 'exercising the executive power,'" and could be provisionally replaced by an acting Director.  Doc. No. 2138966 at 1-2.  The panel also determined that allowing Mr. Abramowitz's removal would not clear the way for a new appointee, because the Advisory Board lacked the quorum required for a vote on a replacement.  *Id.*

The panel did not opine on the government's merits arguments.

19

## SUMMARY OF ARGUMENT

The Court should reverse the district court's order for three reasons. First, the district court lacked jurisdiction over Mr. Abramowitz's employment challenge. The CSRA channels review of such challenges to the MSPB or Office of Special Counsel ("OSC"). As the CSRA established a comprehensive system of review designed to address employment claims like Mr. Abramowitz's, Supreme Court precedent dictates that the district court may not decide the merits of his claim in the first instance.

Second, the removal restrictions in 22 U.S.C. § 6205(e) violate Article II of the Constitution. Article II provides that removal is vested in "the President alone, in the Courts of Law, or in the Heads of Departments." Section 6205(e) violates that provision by requiring Advisory Board approval for the VOA Director's removal. Thus, it diffuses the removal power more broadly than Article II permits and effects a novel and unconstitutional limitation on Executive removal powers.

Third, even if § 6205(e) were constitutional, the injunction would still be invalid because it exceeds the powers given to Article III courts. The injunction effectively requires the reinstatement of Mr. Abramowitz. And that remedy appropriates a power reserved to the Executive under our

20

constitutional structure and many decades of Supreme Court precedent. It is also not a tool traditionally available to courts of equity.

## STANDARD OF REVIEW

The Court reviews a district court's grant of summary judgment de novo. *N.M. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 148 F.4th 755, 764 (D.C. Cir. 2025). Likewise, the Court reviews jurisdictional questions underlying a grant of injunctive relief de novo. *Atlas Air, Inc., v. Int'l Bhd. of Teamsters*, 928 F.3d 1102, 1108 (D.C. Cir. 2019). The Court reviews factual findings for clear error. *See Fam. Tr. of Mass., Inc. v. United States*, 722 F.3d 355, 359 (D.C. Cir. 2013).

## ARGUMENT

The district court's permanent injunction against Mr. Abramowitz's removal reflects three critical errors. First, the district court lacked jurisdiction for the same reason this Court recognized in the *Widakuswara* stay decision. Second, the removal restrictions in 22 U.S.C. § 6205(e) are unconstitutional, which means there is no legal basis to enjoin the Director's removal. Third, the district court lacked the authority to order reinstatement of an executive officer.

21

## I.     The CSRA Requires Channeling This Employment Dispute.

At the threshold, the district court lacked jurisdiction over Mr. Abramowitz's employment challenge because the CSRA channels that challenge instead to the MSPB or OSC. Specifically, federal employees like Mr. Abramowitz may challenge adverse employment actions in the MSPB and may bring claims based on certain "prohibited personnel practices" to the OSC. *See* 5 U.S.C. §§ 1204(a), 1214. The CSRA provides "the exclusive procedures" for such claims. *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 755 (D.C. Cir. 2019) ("*AFGE*").

In *Widakuswara*, the panel adopted a closely related CSRA channeling argument. Specifically, the Court stayed the portion of the preliminary injunction that ordered the Agency to "restore all USAGM employees and personal service contractors . . . to their status prior to March 14, 2015." Dkt. No. 29 (Preliminary-Injunction Order) at 3. It held that the "district court likely lacked jurisdiction over USAGM's personnel actions" and that "Congress has instead established comprehensive statutory schemes for adjudicating employment disputes with the federal government." *Widakuswara*, 2025 WL 1288817, at *2 (citation omitted).

The same reasoning applies here. As in *Widakuswara*, the district court erroneously used the APA to address an employment dispute. This is a classic case of a discharged official challenging his termination. It belongs in the MSPB or OSC.

1. Under the controlling *Thunder Basin* framework, "Congress intended that a litigant proceed exclusively through a statutory scheme . . . when (i) such intent is fairly discernible in the statutory scheme, and (ii) the litigant's claims are of the type Congress intended to be reviewed within [the] statutory structure." *AFGE*, 929 F.3d at 754. At the framework's second step, courts determine that claims are not "the type" Congress intended to channel "in only limited circumstances, when (1) a finding of preclusion might foreclose all meaningful judicial review; (2) the claims are wholly collateral to the statutory review provisions; and (3) the claims are beyond the expertise of the agency." *Id.* at 755 (cleaned up).

At *Thunder Basin*'s step one, the framework yields a clear result, as this Court has recognized many times. The CSRA "established a comprehensive system for reviewing personnel action taken against federal employees." *Elgin v. Dep't of Treasury*, 567 U.S. 1, 5 (2012). And it provides "the *exclusive* avenue for suit" to a plaintiff whose claims fall within its scope. *Grosdidier v.*

23

*Chairman, Broad. Bd. of Governors*, 709 F.3d 19, 23-24 (D.C. Cir. 2013) (emphasis added). Thus, Congress's intent to channel such claims is plainly "discernible." *AFGE*, 929 F.3d at 754.

As for step two, a "challenge to removal" like Mr. Abramowitz's claim "is precisely the type of personnel action regularly adjudicated by the MSPB and the Federal Circuit within the CSRA scheme." *Elgin*, 567 U.S. at 22. Channeling would not "foreclose all meaningful judicial review" because review of agency rulings is available in the Federal Circuit. *See id.* at 21. And challenges to the legality of an executive official's termination are neither "collateral" to the CSRA's review scheme nor beyond the "expertise" of agency adjudicators. *See id.* at 21-22. That the government may raise a constitutional defense does not matter: the Supreme Court rejected "an exception to CSRA exclusivity for facial or as-applied constitutional challenges to federal statutes." *Id.* at 12. "The text and structure of the CSRA . . . provide no support for such an exception." *Id.*

*Elgin*'s reasoning maps onto this case. If employees' "constitutional challenges to federal statutes" are channeled, *Elgin*, 567 U.S. at 14, the same rule follows for employment-related claims with constitutional defenses. If anything, that the constitutional issue arises in the defensive posture makes

24

this case even easier. The presence or absence of federal jurisdiction is generally determined by reference to the complaint—not a responsive pleading. *See District of Columbia v. Exxon Mobil Corp.*, 89 F.4th 144, 148 (D.C. Cir. 2023). Here, Mr. Abramowitz raises a straightforward unlawful-termination claim of the sort regularly channeled under the CSRA.

2. The district court agreed with the government that Congress expressed its intent in the CSRA for litigants "to proceed exclusively through a statutory scheme"—satisfying *Thunder Basin*'s step one. JA106. But it held that Mr. Abramowitz's claim was "wholly collateral" to the CSRA's "statutory scheme" and was beyond the MSPB's "expertise." *Id.* In the district court's view, those holdings followed from its conclusion that "the separation-of-powers question at the heart of this case falls outside the mine-run of CSRA cases." JA107. Though acknowledging that a constitutional claim may be channeled under *Elgin*, the district court distinguished "[c]onstitutional issues that go [to] the heart of employment disputes, like whether an agency's substantive policies unconstitutionally discriminate against government employees," from the issue in this case. *Id.* That reasoning was erroneous.

25

Under *Elgin*, there is no principled basis for holding that some types of constitutional issues are appropriate for agency adjudication while others are not. Again, the Supreme Court there rejected the notion that "facial and as-applied constitutional challenges to statutes may be brought in district court, while other constitutional challenges must be heard by the MSPB." *Elgin*, 567 U.S. at 15. "The availability of administrative and judicial review under the CSRA generally turns on the type of civil service employee and adverse employment action at issue." *Id.* at 12. It does not turn on "the type of claim at issue" (let alone the type of *defense* at issue), except in one specific scenario "expressly exempt[ed]" by the CSRA based on employment-discrimination statutes that themselves "authorize[] an action in federal district court." *Id.* at 13. Given that express exemption, "[t]hat Congress declined to include an exemption from Federal Circuit review for challenges to a statute's constitutionality indicates that Congress intended no such exception." *Id.*

The district court also distinguished *Elgin* because, in its view, Mr. Abramowitz "raises a 'discrete' question" about "whether his termination is contrary to the structure of USAGM and Voice of America." JA94. But claims that a termination violates a statute are not "collateral" to the CSRA's

26

channeling regime. *See AFGE*, 929 F.3d at 760 (explaining that disputes over whether statute has been violated are "not wholly collateral to the statutory scheme"). The district court asserted that *AFGE* does not control because that case "involved a claim that . . . was 'regularly adjudicated' under the agency scheme," and there was "no reason to think that the same is true of the MSPB and the separation of powers question at issue here." JA108. That analysis framed the issue too narrowly. This Court made clear in *AFGE* that it "need not map the precise contours of the [agency's] authority to adjudicate the claims" at issue because "even if the [agency] could not address the claims, circuit courts could do so on appeal." 929 F.3d at 758. Of course, claims the agency found it "could not address" would be claims it did not "regularly adjudicate[]"—yet the Court indicated that such claims could nonetheless be channeled. *See also id.* at 759. Thus, it was not necessary to the *AFGE* Court's channeling decision that the claims at issue were "regularly adjudicated" by the agency.

The district court also erred in its analysis of *Thunder Basin*'s "expertise" inquiry when it held that "[t]he MSPB has no 'special' knowledge 'about the separation of powers' questions that undergird Abramowitz's dispute." JA95. Rejecting the argument that the *Elgin*

27

petitioners' claims were "outside the MSPB's expertise," the Supreme Court noted the "many threshold questions that *may* accompany a constitutional claim and to which the MSPB can apply its expertise." 567 U.S. at 22 (emphasis added). Its analysis did not focus on whether an individual employee's claim necessarily raised such questions. Instead, it described the issue as whether, *in general*, "the MSPB's expertise can otherwise be 'brought to bear' on employee appeals that challenge the constitutionality of a statute." *Id.* at 23; *see also AFGE*, 929 F.3d at 761 ("The question we must ask is whether agency expertise may be brought to bear on the claims, not whether the expertise is essential." (cleaned up)). Here as there, it can.

Finally, Plaintiffs argued below that Congress could not have intended to channel claims like Mr. Abramowitz's because the statute giving the Advisory Board veto power over Director removals was designed "to prevent the exact action Defendants now take." Dkt. No. 80 (Opp. to Stay Pending Appeal) at 3. Similarly, the district court held that Mr. Abramowitz's claim falls outside the CSRA's rubric because "he is among a handful of USAGM network directors to whom the law provides a specialized statutory removal framework." JA94. Those assertions miss the relevant question. The question is where violations of the substantive statute

28

must be adjudicated in the first instance. And the Supreme Court's caselaw does not exempt claims based on specialized statutory removal protections from channeling.

Indeed, the stay panel in *Widakuswara* rejected a similar argument against CSRA channeling when it allowed terminations to go forward despite Plaintiffs' argument that the "President's actions have effectively erased a statutory provision." Opp. to Emergency Mot. for an Admin. Stay and Partial Stay Pending Appeal 18, *Widakuswara v. Lake*, Nos. 25-5144, 25-5145, Doc. No. 2113400 (April 29, 2025). Here as in *Widakuswara*, channeling does not permit erasure of any statutory provision; it simply steers the claim to a different body — the one to which Congress assigned it. And the case for channeling is, if anything, even clearer here because Mr. Abramowitz's asserted harms are strictly employment-related. In sum, that § 6205(e) sets up new substantive removal restrictions says nothing about what forum should consider alleged violations of those restrictions.

3. *Axon* is not to the contrary. *See Axon Enter., Inc. v. FTC*, 598 U.S. 175 (2023). There, the petitioners' claims went "to the core of the FTC's existence" because they challenged the constitutionality of the very administrative process through which they would ordinarily prosecute their claims. *Id.* at

183, 189. The alleged harm—"being subjected to unconstitutional agency authority" in the shape of "a proceeding by an unaccountable ALJ"—was "impossible to remedy once the proceeding [was] over." *Id.* at 191 (quotation marks omitted).  Importantly, the *Axon* Court did not hold that unlawful-termination claims fall outside the CSRA whenever they implicate structural constitutional issues.  Such a result would conflict with *Elgin*'s rejection of "an exception to CSRA exclusivity for facial or as-applied constitutional challenges to federal statutes."  567 U.S. at 12.

The district court's reliance on *Axon*, *see* JA94-95, might have made some sense if Mr. Abramowitz were challenging the constitutionality of the MSPB or OSC process. But he is not. He argues instead that his termination was unlawful because it violated a statute. Unlike the *Axon* petitioners' alleged harms, Mr. Abramowitz's alleged injury is categorically reparable by reinstatement if he prevails in the proper forum.

4. At the stay stage, Plaintiffs argued that channeling does not provide an adequate remedy because agency adjudicators do not "provide immediate equitable relief."  Doc. No. 2135424 at 12. But that does not matter.  This Court has held, for example, that unions' claims must be channeled to an agency adjudicator "even if that made it *impossible* to obtain

30

particular forms of review or relief." *AFGE*, 929 F.3d at 756. Channeling does not foreclose judicial review. It just means that review may happen after the agency adjudicator makes an initial decision; it is "of no dispositive significance whether the agency has the authority to rule on constitutional claims so long as the claims can eventually reach an Article III court fully competent to adjudicate them." *Id.* at 758 (cleaned up).

Nor does it matter that the MSPB lacked a quorum. Channeling is required because Congress assigned claims like Mr. Abramowitz's to agency adjudication; it does not toggle on and off depending on whether the adjudicative body has a quorum. As the district court noted, the MSPB "lacked a quorum from 2017 to 2022," JA94—and during that time, the CSRA's channeling scheme was enforced, *see Jolley v. United States*, 549 F. Supp. 3d 1, 5-6 (D.D.C. 2021). While the MSPB's lack of quorum has thus always been irrelevant, the quorum has now been restored, and its past absence is certainly not sufficient now to defeat channeling.[3]

---

[3] *See* U.S. Merit Systems Protection Board, *Frequently Asked Questions about the Lack of Quorum Period and Restoration of the Full Board*, https://www.mspb.gov/FAQs%20Absence%20of%20Board%20Quorum%2011-14-25.pdf (accessed January 15, 2026). The Court may take judicial notice that the quorum has been restored. *See* Fed. R. Evid. 201(b)(2), (d).

## II.  The Removal Restrictions In § 6205(e) Are Unconstitutional.

Even if the federal courts have jurisdiction at this juncture, the Court should reverse because the Act's removal procedures concerning the VOA Director violate Article II. Specifically, § 6205(e) violates Article II's requirement that "[a]ppointment" and removal of "inferior Officers" may be vested only "in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. Art. II, § 2, cl. 2; *Kennedy v. Braidwood Mgmt., Inc.*, 145 S. Ct. 2427, 2444 (2025) (noting that "the power of removal . . . is incident to the power of appointment" (quotation marks omitted)). The CEO—not the Advisory Board—is the head of the Agency. *See* 22 U.S.C. § 6203(b)(1). Thus, the statute's requirement of Advisory Board approval for the removal of the VOA Director, undisputedly an inferior officer, is inconsistent with Article II.

1. "Article II confers on the President 'the general administrative control of those executing the laws.'" *Free Enterprise Fund v. PCAOB*, 561 U.S. 477, 492 (2010) ("*FEF*"). And because "[t]he buck stops with the President," he "must have some 'power of removing those for whom he can not continue to be responsible.'" *Id.* In some circumstances, Congress may properly delegate that removal power to subordinate executive officials. "Congress

32

may allow" inferior officers "to be appointed by the President alone, by the heads of departments, or by the Judiciary." *Morrison v. Olson*, 487 U.S. 654, 670 (1988). And when Congress vests appointments in the heads of departments, then it is "ordinarily the department head, rather than the President, who enjoys the power of removal." *FEF*, 561 U.S. at 493.

Congress has expressly provided that the CEO "shall be" "[t]he head of [USAGM]." 22 U.S.C. § 6203(b)(1). And because the power to remove an inferior officer, like the power to appoint one, can be vested only in "the President alone, in the Courts of Law, or in the Heads of Departments," U.S. Const. Art. II, § 2, cl. 2, the VOA Director must be removable at will by the President or the CEO, acting on the President's behalf.

The removal scheme here violates that constitutional principle. Making removal a joint concern of the CEO and the Advisory Board—a body designed to "exist within the executive branch" as an "[i]ndependent" entity, 22 U.S.C. § 6205(a); 5 U.S.C. § 104—is a novel and unconstitutional restriction on the President's (and CEO's) removal power. Even assuming the Advisory Board could be viewed as a department head, nothing in the Constitution permits Congress to vest the President's removal power in the "heads of two separate departments."  JA109. Rather, the Supreme Court has

33

consistently rejected attempts by Congress to impose "novel impediment[s] to the President's" removal power. *Seila Law LLC v. CFPB*, 591 U.S. 197, 215 (2020); *see also FEF*, 561 U.S. at 483. And the diffusion of the removal power among several departments is an arrangement that "has no basis in history"—and thus "no place in our constitutional structure." *See Seila Law*, 591 U.S. at 220.

2. The district court disagreed based, first, on its determination that most of the Supreme Court's cases invalidating removal restrictions did so because those restrictions "limit[ed] the *substantive* grounds on which the President or the heads of departments can remove an officer," JA101, whereas the statute here imposes a *procedural* barrier to removal.

That distinction makes no difference. The Supreme Court has recognized "only two exceptions to the President's unrestricted removal power." *Seila Law*, 591 U.S. at 204; *see also Trump v. Wilcox*, 145 S. Ct. 1415, 1415 (2025). Neither exception has anything to do with whether the removal restrictions are substantive or procedural. And neither exception applies here. First, the VOA Director is (undisputedly) not part of a "multimember body of experts . . . perform[ing] legislative and judicial functions." *Seila Law*, 591 U.S. at 216. Second, he is not an "inferior officer[] with limited

34

duties and no policymaking or administrative authority." *Id.* at 218. On the contrary, among other duties, the Director manages VOA's global multimedia content and its administration. JA74. He reports to the Agency's CEO, has significant independence to meet strategic objectives, and represents VOA inside and outside the Agency. JA74-76. In sum, the Director wields significant policymaking and administrative authority.

The district court also distinguished the Supreme Court's cases because here, the CEO and the Advisory Board's members are "removable at will." JA101. The court reasoned that the "road bump" of requiring the President to "remove and replace some or all" of the CEO and Advisory Board prior to removing Mr. Abramowitz (if those individuals disagree with the removal decision) was less of a restriction on removal than that addressed by the Supreme Court in *FEF*. JA102. The court reached that conclusion because it read *FEF* as approving a structure in which Public Company Accounting Oversight Board ("PCAOB") members were removable at will but SEC Commissioners—who had the power to remove PCAOB members—were not. *Id.* The logical conclusion of the district court's reasoning seems to be that as long as someone in the chain of authority is removable at will, then almost anyone may be given the power

35

to remove (or veto removal of) inferior officers with significant policymaking and administrative authority.

That is not the law. The question is not whether individuals making up one layer of the hierarchy are removable at will. Rather, the threshold inquiry is whether either the President or a department head acting on the President's behalf has the power to remove an inferior officer. If the removal power is vested elsewhere or diffused more broadly, the removal scheme violates the separation of powers. Indeed, in *FEF*, the Supreme Court rejected a "new" restricted-removal structure that did not fall within narrow exceptions to the President's general authority to "keep [executive] officers accountable—by removing them from office, if necessary." 561 U.S. at 483; *see also Seila Law*, 591 U.S. at 215 (explaining that *FEF* "declined to extend" previously upheld "limits" on the President's removal power).

Although the district court minimized the "barrier" of needing to replace all of the Advisory Board's "removed members" in order to effectuate Mr. Abramowitz's removal, JA103, the perceived magnitude of the barrier is beside the point. In any event, being required to appoint—and win Senate confirmation for—an all-new Board just to remove an inferior officer is a significant burden on the President's exercise of executive power.

36

Indeed, the burden is exacerbated here because no more than three of the Advisory Board's appointed members may belong to the same political party, and four members (excluding the Secretary of State) are required for a quorum. 22 U.S.C. § 6205(b)(3), (e)(3). Requiring the Executive Branch to obtain the presence of members of the opposition party for any removal decision is even more burdensome than requiring cause for removal.

In sum, the removal restrictions in § 6205(e) are a novel and unconstitutional impediment to the President's ability to supervise subordinate Executive Branch officials. The district court's contrary conclusion finds no support in past practice or the Supreme Court's removal precedents. And it imposes a serious burden on the President's core executive authority.

## III. Courts Lack The Power To Issue Equitable Relief Restoring A Removed Executive Officer.

Even if § 6205(e) were constitutional, the Court should reverse because the district court lacked the authority to enjoin the removal of an executive officer.[4]  Such an injunction violates Article II by substituting a court's

---

[4] The availability of reinstatement as a judicial remedy for executive officials is currently being considered by the Supreme Court in *Trump v.*

*Continued on next page.*

judgment on a personnel issue for the Executive's.    Additionally, because the district court's injunction of Mr. Abramowitz's removal is an "act of equitable discretion," *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006), the district court had power to issue the remedy only if it was one "'traditionally accorded by courts of equity' at our country's inception." *Trump v. CASA, Inc.*, 606 U.S. 831, 841 (2025) (citation omitted).  It was not. Finally, Congress would have to speak clearly to make such a remedy available, given the strong tradition against it.  It has not.

1. Even if Congress could restrict the removal of the VOA Director, a court may not issue an order blocking his removal.  A judicial order blocking removal of an executive officer "deeply intrudes into the core concerns of the executive branch."  *Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at *12 (D.C. Cir. Feb. 15, 2025) (Katsas, J., dissenting).  Indeed, an order preventing a removal *ex post* raises separation-of-powers concerns beyond those presented by *ex ante* legislative removal restrictions.  That is because it requires the President or the head of an agency to entrust executive power to someone he or she has determined should not exercise it.  *Cf. Franklin v.*

*Slaughter*, No. 25-332 (argued Dec. 8, 2025), and *Trump v. Cook*, No. 25A312 (to be argued Jan. 21, 2026).

*Massachusetts*, 505 U.S. 788, 827 (1992) (Scalia, J., concurring) (explaining that executive officers may not be ordered by a court to complete executive acts).

That concern with the constitutional problems with undoing a removal after the fact—even where the grounds for removal might be questioned—dates to the Founding. *See, e.g.*, *Myers v. United States*, 272 U.S. 52, 124 (1926) (quoting Rep. Benson asserting that interfering with the President's removal authority would "force[]" officers onto the President "whom he considered as unfaithful"); *id.* at 132 (quoting Rep. Boudinot arguing that if the Senate could override the President's removal authority, the President would be "surrounded by officers with whom, by his situation, he is compelled to act, but in whom he can have no confidence"). History since then also cuts against the injunction here. Removed executive officers have often sought relief through the political process or through back pay. *See, e.g.*, *Wiener v. United States*, 357 U.S. 349, 350 (1958) (suit "for recovery of his salary"); *Humphrey's Executor v. United States*, 295 U.S. 602, 612 (1935) (suit "to recover a sum of money alleged to be due . . . for salary"); *Myers*, 272 U.S. at 106 (similar); *Shurtleff v. United States*, 189 U.S. 311, 318 (1903) (similar); *Parsons v. United States*, 167 U.S. 324, 326 (1897) (similar). A back-pay order, where available under applicable statutes, compensates the removed officer for loss

39

of salary due to an allegedly improper removal. Such orders avoid the problems that arise when courts force the President or a Head of Department "to recognize and work with an agency head whom he has already removed." *Dellinger*, 2025 WL 559669, at *16 (Katsas, J., dissenting). The district court here dove right into those problems, forcing the Executive to keep in place a VOA Director that the Executive has long since determined should be replaced.

2. Even setting aside constitutional concerns, longstanding precedent makes clear that an injunction against the removal of an executive officer is not an equitable remedy traditionally available in federal court. *See In re Sawyer*, 124 U.S. 200, 212 (1888) (concluding that "it is . . . well settled that a court of equity has no jurisdiction over the appointment and removal of public officers"). For many decades, the Supreme Court has affirmed this principle. *See, e.g.*, *White v. Berry*, 171 U.S. 366, 377 (1898) ("[A] court of equity will not, by injunction, restrain an executive officer from making a wrongful removal of a subordinate appointee, nor restrain the appointment of another.") (citation omitted)); *Walton v. House of Representatives*, 265 U.S. 487, 490 (1924) (stating that a "court of equity has no jurisdiction over the appointment and removal of public officers."); *Baker v. Carr*, 369 U.S. 186, 231

40

(1962) (citing decisions that "withheld federal equity from staying removal of a federal officer" as reflecting "a traditional limit upon equity jurisdiction[]"); *see also Bessent v. Dellinger*, 145 S. Ct. 515, 517 (2025) (Gorsuch, J., dissenting) (explaining that "by the 1880s this Court considered it 'well settled that a court of equity has no jurisdiction over the appointment and removal of public officers'") (citation omitted)).  And commentators have explained that "[n]o principle of the law of injunctions, and perhaps no doctrine of equity jurisprudence, is more definitely fixed or more clearly established than that courts of equity will not interfere by injunction to determine questions concerning the appointment of public officers or their title to office."  2 James L. High, *Treatise on the Law of Injunctions* § 1312, at 863 (2d ed. 1880).

More recently, members of this Court have commented on the ahistorical and extraordinary nature of an order reinstating an executive officer.  As Judge Rao observed, "[t]here is simply no precedent for such expansive judicial directives against officers of the Executive Branch wielding essential executive powers."  *Harris v. Bessent*, No. 25-5037, 2025 WL 1021435, at *4 (D.C. Cir. Apr. 7, 2025) (en banc) (per curiam) (Rao, J.,

dissenting) (footnote omitted).[5] Judge Katsas has similarly emphasized the "extraordinary character" of a court mandating "the President to recognize and work with an agency head whom he has already removed." *Dellinger*, 2025 WL 559669, at *12 (Katsas, J., dissenting).

The historical absence of such injunctions makes sense. Reinstatement orders can cause "the utmost confusion in the management of executive affairs," *White*, 171 U.S. at 378, including by subjecting the government to "the disruptive effect of the repeated removal and reinstatement of officers during the pendency of litigation," *Wilcox*, 145 S. Ct. at 1415. By contrast, removals do not irreparably harm removed officers, who have no judicially cognizable private interest in continuing to exercise "political power." *See Raines v. Byrd*, 521 U.S. 811, 821 (1997). In sum, because no traditional equitable principle allows for an injunction against removal of an executive

---

[5] Although a majority of the en banc Court held in *Harris* that the government had "not shown a strong likelihood of success on the merits of its claim that there is no available remedy for" the removed officers, the Court did not decide the merits of the issue. *Harris*, 2025 WL 1021435, at *2. Thus, *Harris* does not bind the Court on that issue. The Court should review the government's argument on its merits with full consideration of the relevant caselaw and equitable tradition.

officer, the district court exceeded its authority in issuing one. *See CASA*, 606 U.S. at 841-42.

3. At a minimum, if Congress wishes to authorize courts to block removals, it must say so expressly. The Supreme Court's precedents require "an express statement by Congress" to authorize remedies that could burden the President's Article II powers. *Franklin*, 505 U.S. at 801. The Court has also required "clear and explicit language" before interpreting statutes to burden the President's removal power; "inference or implication" does not suffice. *Braidwood*, 145 S. Ct. at 2448. And the Court usually presumes that, if Congress intends "a drastic departure from the traditions of equity practice," it makes "an unequivocal statement." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944).

Not only did Congress not make such an "unequivocal statement" in the International Broadcasting Act; it also made clear through the CSRA that officials like the VOA Director are *barred* from seeking reinstatement in federal court as a remedy for alleged statutory violations. *See supra* § I. For federal employees, "what you get under the CSRA is what you get." *Fornaro v. James*, 416 F.3d 63, 67 (D.C. Cir. 2005). As discussed, employees covered by the CSRA may seek reinstatement and back pay before the MSPB or OSC,

43

with review in the Federal Circuit. That "integrated scheme of administrative and judicial review" "balance[s] the legitimate interests of the various categories of federal employees with the needs of sound and efficient administration." *United States v. Fausto*, 484 U.S. 439, 443 (1988). In short, even if reinstatement were otherwise available as a judicial remedy for removed officers—which it is not—the CSRA would foreclose it for the VOA Director.

## CONCLUSION

The Court should reverse.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

YAAKOV M. ROTH
  *Principal Deputy Assistant
      Attorney General*

*/s/ Elizabeth Hedges*

ELIZABETH HEDGES
JOHN BAILEY
ABIGAIL STOUT
  *Civil Division
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (771) 209-1978
  Elizabeth.T.Hedges@usdoj.gov*

January 2026

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 8,832 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Book Antiqua 14-point font, a proportionally spaced typeface.

*/s/ Elizabeth Hedges*
Elizabeth Hedges

**CERTIFICATE OF SERVICE**

I hereby certify that on January 15, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*/s/ Elizabeth Hedges*
Elizabeth Hedges