**ORAL ARGUMENT SCHEDULED FOR APRIL 23, 2026**

No. 25-5314

# United States Court of Appeals
# For the District of Columbia Circuit

———————————

MICHAEL ABRAMOWITZ, *et al.*,

*Plaintiffs-Appellees*,

v.

KARI LAKE, *et al.*,

*Defendants-Appellants*.

———————————

On Appeal from the United States District Court for the District of Columbia
No. 25-cv-00887-RCL, The Honorable Royce C. Lamberth, District Judge

———————————

**BRIEF FOR APPELLEES**

———————————

WILLIAM B. SCHULTZ
JACOBUS P. VAN DER VEN
BRIAN J. BEATON, JR.
ZUCKERMAN SPAEDER LLP
2100 L Street NW, Suite 400
Washington, DC 20037
Telephone: (202) 778-1800
Fax: (202) 822-8136
wschultz@zuckerman.com
cvanderven@zuckerman.com
bbeaton@zuckerman.com

*Counsel for Plaintiffs-Appellees*

February 27, 2026

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Appellees certify as follows:

### A.    Parties and *Amici*

All parties and *amici* appearing before the District Court and in this Court are listed in the Brief for Appellants.

### B.    Ruling Under Review

References to the ruling at issue appear in the Brief for Appellants.

### C.    Related Cases

A separate appeal in this case is currently pending in No. 25-5145 (D.C. Cir.), in which a panel of this Court entered a partial stay pending appeal, *see* 2025 WL 1288817 (D.C. Cir. May 3, 2025).  The Brief for Appellants identifies the other related cases before the District Court as well as the related cases on appeal.

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

TABLE OF AUTHORITIES ...................................................................................iv

GLOSSARY.........................................................................................................ix

INTRODUCTION ................................................................................................1

STATEMENT OF THE ISSUES...........................................................................3

PERTINENT STATUTES AND REGULATIONS ................................................3

STATEMENT OF JURISDICTION.....................................................................4

STATEMENT OF THE CASE..............................................................................4

    A.     Statutory Background.......................................................................4

    B.     Factual and Procedural History ........................................................7

SUMMARY OF THE ARGUMENT .....................................................................11

ARGUMENT .......................................................................................................14

    I.     THE DISTRICT COURT HAD JURISDICTION TO ENFORCE CONGRESS'S STATUTE. ...........................................15

         A.     Congress Did Not Intend to Strip Courts' Jurisdiction for This Type of Claim. ........................................17

         B.     The Three *Thunder Basin* Factors All Point in the Same Direction...........................................................19

    II.    THE REMOVAL PROCESS CONGRESS ESTABLISHED IS CONSTITUTIONAL...............................................25

         A.     Because There is No Removal Restriction, No Exception From Unrestricted Removal is Required................27

B. Even if an Exception is Required, the VOA Director is an Inferior Officer Subject to the Inferior-Officer Exception ................................................................................39

III. COURTS HAVE THE POWER TO PREVENT DEFENDANTS' UNLAWFUL ACTION..........................................44

A. D.C. Circuit Law is Settled on This Score................................45

B. Abramowitz's Case Presents Additional Reasons to Adhere to Settled Law. ............................................................49

CONCLUSION.................................................................................................51

CERTIFICATE OF COMPLIANCE....................................................................53

# TABLE OF AUTHORITIES

## CASES

*Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*,
121 F.4th 1314 (D.C. Cir. 2024).........................................................................16

*Aviel v. Gor*,
No. 25-5105, 2025 WL 1600446 (D.C. Cir. June 5, 2025) ......................... 39, 46

*Axon Enter., Inc. v. F.T.C.*,
598 U.S. 175 (2023)....................................... 16, 17, 20, 21, 22, 23, 24

*Buckley v. Valeo*,
424 U.S. 1 (1976).............................................................................................42

*Elgin v. Dep't of Treasury*,
567 U.S. 1 (2012)......................................................... 21, 22, 23, 24

*Ex parte Siebold*,
100 U.S. 371 (1879).........................................................................................32

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010)..........................19, 23, 29, 34, 35-36, 37, 39, 40, 41, 43, 44

*Harris v. Bessent*,
No. 25-5037, 2025 WL 1021435 (D.C. Cir. Apr. 7, 2025) ...............................46

*Humphrey's Ex'r v. United States*,
295 U.S. 602 (1935).........................................................................................48

*In re Sawyer*,
124 U.S. 200 (1888).........................................................................................47

*Jarkesy v. S.E.C.*,
803 F.3d 9 (D.C. Cir. 2015) ...................................................................... 16, 19

*Lucia v. S.E.C.*,
585 U.S. 237 (2018).........................................................................................42

*Marbury v. Madison*,
5 U.S. 137 (1803).............................................................................................47

*Morrison v. Olson*,
  487 U.S. 654 (1988)............................................................. 31, 32, 33

*Rodriguez de Quijas v. Shearson/American Express, Inc.*,
  490 U.S. 477 (1989)...........................................................................49

*Sampson v. Murray*,
  415 U.S. 61 (1974).............................................................................47

*Seila L. LLC v. Consumer Fin. Prot. Bureau*,
  591 U.S. 197 (2020)........................................................ 26, 30, 37, 42

*Severino v. Biden*,
  71 F.4th 1038 (D.C. Cir. 2023)..........................................................45

*Silver v. U.S. Postal Serv.*,
  951 F.2d 1033 (9th Cir. 1991) ...........................................................36

*Swan v. Clinton*,
  100 F.3d 973 (D.C. Cir. 1996) ..................................................... 45, 50

*Thunder Basin Coal Co. v. Reich*,
  510 U.S. 200 (1994)................................................ 15, 16, 19, 22, 25

*Trump v. Wilcox*,
  145 S. Ct. 1415 (2025).......................................................................51

*United States v. Hartwell*,
  73 U.S. 385 (1867)............................................................................35

*United States v. Perkins*,
  116 U.S. 483 (1886)..................................................................... 33, 40

*White v. Berry*,
  171 U.S. 366 (1898)...........................................................................47

*Widakuswara v. Lake*,
  No. 25-5145, 2025 WL 1288817 (D.C. Cir. May 3, 2025) .............8, 24

*Wiener v. United States*,
  357 U.S. 349 (1958)...........................................................................48

v

## STATUTES

5 U.S.C. § 104 ................................................................................ 27, 30, 36

5 U.S.C. § 7104(a) ...................................................................................38

5 U.S.C. § 7105(d) ...................................................................................38

7 U.S.C. § 2(a)(2)(A) ...............................................................................38

7 U.S.C. § 2(a)(4)-(6) ...............................................................................38

7 U.S.C. § 2(a)(6)(C) ...............................................................................35

12 U.S.C. § 242 ........................................................................................43

12 U.S.C. § 1819 ......................................................................................38

12 U.S.C. § 2242(a) .................................................................................38

12 U.S.C. § 2245(b) ............................................................................ 36, 38

12 U.S.C. § 304 .................................................................................. 35, 38

12 U.S.C. § 305 .................................................................................. 35, 38

12 U.S.C. § 341 .................................................................................. 35, 38

12 U.S.C. § 635a(c)(2) .............................................................................38

12 U.S.C. § 635a(c)(7) .............................................................................38

15 U.S.C. § 2053(c) .................................................................................38

15 U.S.C. § 2053(g)(1)(A) .................................................................. 35, 38

22 U.S.C. § 6201(2) ...................................................................................4

22 U.S.C. § 6201(4) ...............................................................................4, 40

22 U.S.C. § 6202(a)(5), (b)(1), (c)(1) ......................................................40

22 U.S.C. § 6202(a)(5), (c)(1) ...............................................................5, 17

22 U.S.C. § 6202(b)(1)...........................................................................4, 5

22 U.S.C. § 6202(c) ........................................................................5, 18

22 U.S.C. § 6204(b) ........................................................................5, 27

22 U.S.C. § 6205(a) ........................................................... 6, 27, 28, 30

22 U.S.C. § 6205(b)(1)(A) .....................................................................6

22 U.S.C. § 6205(b)(3) ....................................................................6, 27

22 U.S.C. § 6205(c)(2) ...........................................................................6

22 U.S.C. § 6205(d)(3)-(4) ...................................................................28

22 U.S.C. § 6205(e)(1) ........................................................... 7, 28, 34

29 U.S.C. § 154(a) ...............................................................................38

47 U.S.C. § 154(f)(1) ...........................................................................38

52 U.S.C. § 30106(a)(1) .......................................................................38

52 U.S.C. § 30106(f)(1) ........................................................................38

## OTHER AUTHORITIES

1 Annals of Congress 389-90 (1789) (Joseph Gales ed., 1834) ....................... 27, 32

*Appointment and Removal of Federal Reserve Bank Members of the FOMC*,
    43 Op. O.L.C. 263 (2019) ...............................................................................43

Letter from Sens. Rubio, Graham, Moran, Collins, Durbin, Leahy, and Van Hollen
    to Michael Pack at 1 (July 1, 2020), https://perma.cc/B3VZ-84E5 ......... 6, 17, 18

Ronald Reagan, *Remarks at a Ceremony Commemorating the 40th Anniversary of
    the Voice of America* (Feb. 24, 1982),
    https://www.reaganlibrary.gov/archives/speech/remarks-ceremony-
    commemorating-40th-anniversary-voice-america .................................................4

## REGULATIONS

22 C.F.R. § 513.105 .........................................................................28

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. II, § 2, cl. 2 ................................................................ 3, 12, 29, 31, 42

# GLOSSARY

| | |
|---|---|
| CEO | Chief Executive Officer |
| CSRA | Civil Service Reform Act |
| MSPB | Merit Systems Protection Board |
| OSC | Office of Special Counsel |
| SEC | Securities and Exchange Commission |
| USAGM | United States Agency for Global Media |
| VOA | Voice of America |

## INTRODUCTION

To promote peace and stability, Congress created Voice of America (VOA) to broadcast impartial news to countries where propaganda and repression prevent people from knowing the truth. Accomplishing this mission requires credibility. It requires adhering to the highest journalistic standards, including abiding by a firewall that protects journalists from undue influence. VOA can only serve its purpose if VOA's audience trusts it to deliver accurate and objective news.

In recent years, VOA's credibility has been tested. In 2020, the CEO of the U.S. Agency for Global Media (USAGM), VOA's parent organization, indiscriminately fired the network heads under the USAGM umbrella. Worrying that these actions risked undermining the credible journalism that is core to VOA's influence, Congress overwhelmingly voted to curtail the CEO's appointment and removal power. Congress removed unilateral hiring and firing authority from the CEO and placed final authority to appoint and remove the head of VOA in a multi-member board of subject matter experts: the International Broadcasting Advisory Board (referred to in this brief as the "Board").

But while Congress sought to limit the CEO's authority, it did not limit the President's authority. The Board members, like the CEO, are appointed by the President and removable by him at will. Nor did Congress give the VOA director, an inferior officer, for-cause removal protection. Keeping all else consistent,

Congress simply transferred final hiring and firing authority from the USAGM CEO to the Board.

Defendants—which include those exercising the now-reduced authority of the CEO—are unwilling to abide by Congress's command. They have taken the exact action Congress legislated to prevent, announcing the Acting CEO's decision to unilaterally fire the VOA director, Michael Abramowitz, without any involvement of the Board. The District Court enjoined Defendants from doing so, finding their action "plainly contrary to law." JA98.

In their appeal, Defendants list three reasons they think the District Court was wrong to enforce Congress's statute. Their leadoff argument is that they should be allowed to take the exact action Congress forbid because Congress intended, in a separate statute, to strip courts of the power to act. Congress did not. It kept jurisdiction with the entity capable of enforcing its legislative command. And while Defendants rely heavily on this Court's prior stay-posture ruling in *Widakuswara*, this legislative scheme was not considered there.

Defendants next ask this Court to declare Congress's statute unconstitutional. But the constitutional text is clear, and the District Court's conclusion that Defendants' argument contravenes "binding precedent" is correct. JA102. The Appointments Clause expressly gives Congress the power to "vest the Appointment" and removal of an "inferior Officer[] … in the Heads of

2

Departments." U.S. Const. art. II, § 2, cl. 2.  Here the VOA director is an inferior officer, and the Board qualifies as a department head.  Defendants do not claim otherwise.

Even if Defendants are wrong about everything else, they still think they should be able to fire the VOA director.  That's because, they say, courts have no equitable power to reinstate an officer.  But the law in this Circuit is clear that courts have this exact power, a point highlighted by Defendants' reliance on dissents.

This Court should affirm the District Court.

## STATEMENT OF THE ISSUES

1. Congress provided that the VOA director cannot be removed absent a vote of the Board.  Did the Civil Service Reform Act deprive the District Court of the power to adjudicate violations of Congress's removal statute?

2. Does the law requiring that the Board approve the appointment and removal of the VOA director violate Article II of the Constitution?

3. Do Article III courts have the authority to enjoin Defendants from disobeying Congress's express removal procedures?

## PERTINENT STATUTES AND REGULATIONS

All applicable statutes and regulations are contained in the Brief for Appellants.

## STATEMENT OF JURISDICTION

This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(2). The District Court had subject matter jurisdiction under 28 U.S.C. § 1331.

## STATEMENT OF THE CASE

### A.    Statutory Background

VOA is an international news outlet that broadcasts through digital, television, and radio platforms. It launched during the height of World War II with a simple, but powerful mission: counter Nazi propaganda through truthful reporting delivered to German citizens living under the Nazi regime. JA36.

VOA has continued this mission for more than eighty years, bringing "consistently reliable" news to countries that "lack adequate sources of free information." 22 U.S.C. §§ 6201(4), 6202(b)(1). Its responsibility, in the words of President Ronald Reagan, is to "bring[] truth to light in a world groping in the darkness of repression and lies."[1] By doing so, VOA "contributes to international peace and stability." 22 U.S.C. § 6201(2).

---

[1] Ronald Reagan, *Remarks at a Ceremony Commemorating the 40th Anniversary of the Voice of America* (Feb. 24, 1982), https://www.reaganlibrary.gov/archives/speech/remarks-ceremony-commemorating-40th-anniversary-voice-america.

VOA's power lies in its impartiality. Listeners must trust VOA to deliver truthful news: "To be effective, the Voice of America must win the attention and respect of listeners." *Id.* § 6202(c). For that reason, Congress required that VOA's news coverage be "accurate, objective, and comprehensive" and "conducted in accordance with the highest professional standards of broadcast journalism." *Id.* § 6202(a)(5), (c)(1). To sustain international public trust in VOA's reporting, Congress also created a separation between newsroom staff and certain government officials. While those officials supervise VOA, they "shall respect the professional independence and integrity of the Agency, its broadcasting services, and the grantees of the Agency." *Id.* § 6204(b); *see also id.* § 6202(a)(5), (b)(1).

A few years ago, even with this firewall in place, the perceived independence—and thus mission—of VOA was threatened. In the June 2020 "Wednesday Night Massacre," Michael Pack, a newly appointed CEO of USAGM, summarily fired several network heads. JA84.

That is not what Congress envisioned. A bipartisan letter signed by seven Senators, including then-Senator Marco Rubio and Senator Lindsey Graham, explained that the networks' foundation was their "independence," a necessary trait to create "credible journalism" that could "act as a bulwark against

disinformation."[2]  The CEO's "termination of qualified, expert … network heads for no specific reason" threatened the networks' "ability to implement their statutory missions."[3]

In response, Congress acted.  It firmed up USAGM's statutory mission by making a change to the organization's governance structure, limiting the CEO's hiring and firing authority.  By a vote of 81 to 13 in the Senate and 322 to 87 in the House, Congress empowered a multi-member, bipartisan Board, established, not within USAGM, but as a separate "entity" "within the executive branch."  22 U.S.C. § 6205(a).  This Board is expert.  Its members must be "distinguished in the fields of public diplomacy, mass communications, print, broadcast or digital media, or foreign affairs."  *Id.* § 6205(c)(2).  It is politically accountable.  Its members are appointed by the President, confirmed by the Senate, and removable by him at will.  *Id.* § 6205(b)(1)(A).  It is balanced.  Of its seven members, only four can be from the President's party.  *Id.* § 6205(b)(3).  And, critically, it has an oversight role, limiting the unilateral authority of the USAGM CEO.  Among other oversight duties, the appointment and removal power of network heads is now vested primarily in the Board, which must approve any appointment or

[2] Letter from Sens. Rubio, Graham, Moran, Collins, Durbin, Leahy, and Van Hollen to Michael Pack at 1 (July 1, 2020), https://perma.cc/B3VZ-84E5.

[3] *Id.*

6

removal recommendation. "[A]ppoint[ing] or remov[ing]" the "head[] of Voice of America" now requires a "majority vote of the Advisory Board," and a vote of five members (one more than a majority) can "unilaterally" remove a network head. *Id.* § 6205(e).

## B.    Factual and Procedural History

In April 2024, the Board unanimously approved the appointment of Michael Abramowitz to serve as the director of VOA. JA47. Abramowitz has a long career in journalism. He has been the president of Freedom House, the director of the United States Holocaust Memorial Museum's Levine Institute for Holocaust Education, and, for 24 years, a reporter, White House correspondent, and national editor at *The Washington Post*. JA36.

Abramowitz actively served in his role for approximately nine months, including for about two months under the new presidential administration. On March 15, 2025, however, USAGM then-Senior Advisor Kari Lake notified Abramowitz that he was being placed on administrative leave "until further notice." JA40. Defendants also took steps to radically downsize VOA, including by placing most employees and contractors on administrative leave, shutting down its stations, and cancelling its contracts. JA40. For the first time in history, VOA went dark. JA41-42.

Following Defendants' steps to dramatically reduce VOA, Abramowitz sued to restore VOA's statutorily mandated functions. The District Court entered a preliminary injunction, most of which is currently on appeal to this Court in No. 25-5145, and some of which a motions panel of this Court stayed pending appeal. *See Widakuswara v. Lake*, No. 25-5145, 2025 WL 1288817 (D.C. Cir. May 3, 2025).

In July 2025, while litigation was pending, Abramowitz received a letter informing him that he would be removed from his "current position of Director, Voice of America"—from which he was on administrative leave—and reassigned to a different role as Chief Management Officer in Greenville, North Carolina. JA53. The letter said that Abramowitz had three weeks to "accept this reassignment" or decline it and be "subject to removal under adverse action procedures." JA53.

Absent from the letter was any mention of the Board. That is because it had not voted. In fact, its members had been fired by the President in January 2025. JA49. The Board played no role in Defendants' decision to remove Abramowitz from his position as VOA director.

Abramowitz responded to Defendants' letter in the only way consistent with his duty to uphold VOA's statutory mission: by pointing out that the decision to "remove [him] from [his] position as Director of Voice of America[] … is

illegal" because, "[u]nder the law," the VOA director "can only be removed … with the approval of the International Broadcasting Advisory Board." JA61.

In response, Defendants notified Abramowitz that they intended to "remove [him] from the … Federal Service" altogether, in addition to removing him from his position as VOA director. JA64. Abramowitz received a notice removing him from Federal Service on August 1, 2025. JA64.

Abramowitz thus filed a motion for partial summary judgment in the district court litigation, contending that Defendants had no authority to remove him without a vote of the Board. ECF 59. In opposing relief, Defendants did not suggest that they had abided by Congress's directive, but instead objected to the District Court's jurisdiction, argued that Congress's statute requiring a vote of the Board was unconstitutional, and contended that the District Court did not possess equitable power to address Defendants' statutory violation. *See generally* ECF 65.

The District Court did not accept Defendants' contentions. It first concluded that it had jurisdiction, holding that the Civil Service Reform Act's (CSRA's) channeling of "mine-run federal" employment claims did not apply to the "specialized statutory removal framework" at issue. JA94. It then turned to Defendants' constitutional argument. Relying on "binding precedent," the District Court declined Defendants' "invitat[ion] … to declare § 6205(e)(1)

9

unconstitutional." JA100-102. It thus ruled that Abramowitz's removal was "plainly contrary to law," because Defendants had undisputedly disregarded the statute's commands. JA98-103. And the District Court then held that it had the power to enjoin Defendants from firing Abramowitz without complying with the statute, because "the dissent on which Defendants' rely is, by its nature, not the current state of the law." JA104 n.5. The District Court thus granted the motion for partial summary judgment, enjoining Defendants "from removing Plaintiff Abramowitz from his position as director of Voice of America without the approval of a majority of the International Broadcasting Advisory Board." JA81.

Defendants moved for a stay in the District Court, which that court denied. JA105. Defendants also moved for a stay pending appeal in this Court, which was denied on the ground that the government had not shown irreparable harm. In explaining why there was no immediate harm, the panel concluded that the "Director of Voice of America is an inferior officer, and neither the President nor the CEO of the U.S. Agency for Global Media may remove or appoint anyone to that position without majority approval of the International Broadcasting Advisory Board, 22 U.S.C. § 6205(e), a separate Executive Branch agency that has been inquorate since January 2025." Order, Doc. No. 2138966 (Oct. 6, 2025).

10

**SUMMARY OF THE ARGUMENT**

1. The District Court had jurisdiction to enforce Congress's specialized removal procedures for USAGM network heads.  Defendants admit that they ignored Congress's command but argue that the District Court was powerless to stop them because Congress impliedly stripped courts of jurisdiction to enforce Congress's statute.

But if Congress so intended, its statute, which requires Board approval before the director of VOA may be removed, would have no practical impact.  If violations of Congress's remedy were channeled to administrative agencies, rather than going to an Article III court, cases would have to wind their way through this administrative scheme and the courts, possibly for years, before the statute could be enforced.  During that time, which would account for a large chunk of any CEO's tenure, the CEO would be able to take the exact move Congress forbid.  That cannot have been Congress's intent when promulgating the specific statutory scheme at issue.

The specific factors that guide courts in this congressional intent inquiry point in the same direction.  This is not the type of case that the Merit Systems Protection Board (MSPB)—or any of the other executive branch agencies—have expertise or authority to review.  At issue here is a specialized scheme applicable to just a few government leaders.  And the only legal issue is a constitutional one:

11

Whether Congress had authority to pass its statute. This is not the type of case the executive branch administrative agencies were set up to adjudicate, and not the type of case Congress intended to direct their way.

2. Congress's chosen removal procedures are constitutional. Defendants argue that Congress's decision to take hiring and firing responsibility away from the CEO and place it primarily in the hands of a multi-member Board is an unconstitutional infringement on the President's Article II power. But while the CEO's power is reduced, the President's is not. Both the VOA director and all members of the Board are removable at will; no person is protected by for-cause removal.

Congress's decision follows precisely the authority the Founders gave Congress in the Appointments Clause. Congress has the discretion to "vest the Appointment" and removal of an "inferior Officer[] … in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2. That is precisely what Congress did here. All agree that the VOA director is an inferior officer and Defendants do not challenge that the Board qualifies as a department head. Those facts are dispositive.

While Defendants raise questions about Congress's decision, those questions are answered by binding precedent. Defendants suggest that, because the Board "approves" appointment and removal (someone else can make the

12

initial recommendation), removal authority is diffuse. But an unbroken and century-long line of Supreme Court cases make clear that, for Article II purposes, appointment is "vested" only in the entity that "approves" the appointment—just what the Board does here. Defendants next suggest that placing this removal power in a multi-member board is a burden on the President. But this is a structure that the Supreme Court has upheld and is common across the federal government. Finally, while Defendants point out that the head of VOA reports to the "head" of USAGM, there is nothing unconstitutional about this arrangement. The Supreme Court has made clear that the Appointments Clause permits *inter*branch appointments. And if those appointments, which can raise separation-of-powers concerns, pass constitutional muster, then *intra*branch appointments—like the one here, where everyone is in the same branch of government and accountable to the President—certainly do too. That is particularly so when the appointing entity (here, the Board), has direct oversight responsibility for the department in which the appointed inferior officer sits (here, USAGM). Finally, if this Court sees Congress's statute as a removal restriction that requires an exception, there is one: the inferior-officer exception.

3. As a last-ditch effort, Defendants say that, even if the District Court had jurisdiction and even if the statute Defendants failed to abide by is constitutional, the District Court lacked the ability to issue an injunction preventing

Abramowitz's termination. This argument is familiar to this Court; the government has raised it in nearly every challenge to its string of unlawful removals. But the law in this Circuit is clear: District courts have the authority to reinstate wrongfully terminated officials or prevent their removal.

## ARGUMENT

In 2020, the CEO of USAGM unilaterally fired the heads of various networks in the USAGM umbrella. Congress viewed these firings as a political move that threatened the impartiality and integrity at the center of VOA's mission. Congress thus fixed this issue by moving unilateral hiring and firing responsibility for network heads out of the hands of the USAGM CEO, placing final authority instead in the hands of a seven-member expert Board, appointed by the President. Now, just a few years later, Defendants—a list that includes those exercising the power of the CEO of USAGM[4]—have tried to claw back the power Congress took away. Defendants have unilaterally taken the exact move Congress forbid, attempting to fire the VOA director without the required approval of the Board.

---

[4] While the official title of Defendant Kari Lake has varied over the course of this litigation (and has included Acting CEO, Deputy CEO, and Senior Advisor), Plaintiffs understand that both currently and for much of this litigation's history, she has exercised the authority of the CEO. That was certainly true at a critical juncture in this litigation. Defendant Lake was listed as the "Acting Chief Executive Officer of USAGM" in Defendants' letter terminating Abramowitz's employment. JA68.

14

The District Court was right to stop them. Congress did not strip the courts of jurisdiction to enforce this specialized removal statute, the statute is a routine exercise of the power the Appointments Clause grants Congress, and courts have authority to order injunctions requiring compliance.

## I.    THE DISTRICT COURT HAD JURISDICTION TO ENFORCE CONGRESS'S STATUTE.

This dispute belongs in an Article III court, the only entity capable of effectively enforcing Congress's statute. Defendants claim that district courts are powerless to enforce the statute at issue here because Congress barred federal district courts from adjudicating violations. Specifically, Defendants contend that Congress, in the CSRA—a statute passed well before § 6205(e)'s protection for network heads—stripped federal courts of jurisdiction to hear Abramowitz's § 6205(e) challenge, requiring that he proceed through an executive branch administrative agency.

Whether Congress stripped a court of jurisdiction by channeling a claim through an administrative scheme is a two-step inquiry. The first step asks whether it is "fairly discernable" that Congress intended the scheme—here the CSRA—to be the exclusive remedy for claims within its scope. *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994). The second step asks about that

15

scope: Whether the specific "claims are of the type Congress intended to be reviewed within" the CSRA's administrative scheme. *Id.* at 212.

This appeal focuses on the second step. When Congress recently created a bespoke removal statute for a handful of USAGM network heads—§ 6205(e)—it did not intend for claims alleging a violation to be channeled into the CSRA's scheme for mine-run federal employment claims (even if that scheme is exclusive for the claims within its scope).

In this step-two channeling inquiry, the "ultimate question" is what "Congress intended" for the particular type of "claim" at issue. *Jarkesy v. S.E.C.*, 803 F.3d 9, 12, 17 (D.C. Cir. 2015); *accord Axon Enter., Inc. v. F.T.C.*, 598 U.S. 175, 186 (2023) ("The ultimate question is how best to understand what Congress has done."). Although the three specific factors discussed in subsection B below help guide this inquiry, courts often begin by evaluating intent at a more general level. They look to the "30,000-foot view of the issue" of congressional intent, *Axon*, 598 U.S. at 189, focusing on what makes "common[] sense," *Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1336 (D.C. Cir. 2024). We take the same approach. As explained in subsection A below, channeling enforcement to an administrative body would effectively nullify Congress's statute in direct contravention of Congress's reason for passing it.

16

### A. Congress Did Not Intend to Strip Courts' Jurisdiction for This Type of Claim.

Like in *Axon*, the "answer" to the general question of congressional intent is "not very hard." *Axon*, 598 U.S. at 188. Congress had a very particular purpose in enacting § 6205(e), the statute at the center of this case. Several members wrote about it in a letter to former CEO Michael Pack, after he fired several USAGM network heads.

These key Congressional members believed that Pack's "termination of qualified, expert … network heads for no specific reason" threatened VOA's core mission.[5] That mission is to reach the citizens of foreign authoritarian regimes and "act as a bulwark against disinformation through credible journalism."[6] But the power of VOA (and its sister networks) to have this effect depends on the "credibility and independence of these networks," something that is "required by law."[7] *See also* 22 U.S.C. § 6202(a)(5), (c)(1) (VOA's news coverage must be "accurate, objective, and comprehensive" and "conducted in accordance with the highest professional standards of broadcast journalism."). As Congress wrote into

---

[5] Letter from Sens. Rubio, Graham, Moran, Collins, Durbin, Leahy, and Van Hollen to Michael Pack at 1 (July 1, 2020), https://perma.cc/B3VZ-84E5.

[6] *Id.*

[7] *Id.*

the governing legislation, "[t]o be effective, the Voice of America must win the attention and respect of listeners."  22 U.S.C. § 6202(c).

That is what Pack's firing of officials threatened.  Terminating qualified network heads without a legitimate reason, Members of Congress said, threatened the ability of VOA and its sister networks to be considered "credible journalism" and thus fulfill "their statutory missions now and in the future."[8]

Therefore, to preserve this mission, Congress made a change to the networks' governance structure.  It enacted legislation to remove hiring and firing authority from the CEO, who had abused it, and placed it in a multi-member, expert Board.  As the District Court put it, Congress enacted a "specialized statutory removal framework" for just "a handful of USAGM network directors."  JA94.

But Congress's fix will not work if it cannot be timely enforced.  The harms to VOA's mission from a political firing are immediate.  The international audience central to VOA's mission may question the reliability of all news that emanates from the newsroom after that firing.  But it can take years for a case to wind its way through the administrative agency and the courts, before there can be an enforceable order to reinstate a wrongfully removed network head.  By then,

---

[8] *Id.*

the damage is done.  In addition, the CEO of USAGM is presidential appointee, whose term is, traditionally, limited.  So if judicial review is delayed, the CEO may be able to effectively ignore Congress's statute, taking the exact action Congress forbid without repercussion for his or her entire tenure.  In these circumstances, it seems peculiar to suggest, as Defendants do, that "Congress intended" to strip courts of jurisdiction to enforce its statute.  If that were the case, Congress's statute would fail to serve its purpose.

### B. The Three *Thunder Basin* Factors All Point in the Same Direction.

Drilling down into the three factors that aid the second-step inquiry confirm this conclusion.  Those three factors are whether (1) "a finding of preclusion could foreclose all meaningful judicial review"; (2) the suit is "'wholly "collateral' to a statute's review provisions"; and (3) the claims are "outside the agency's expertise."  *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010) (quoting *Thunder Basin,* 510 U.S. at 212-213).

While these three factors serve as "guideposts," this Court has cautioned that they should not be applied as "distinct inputs into a strict mathematical formula."  *Jarkesy*, 803 F.3d at 17.  The "ultimate" question, as always, remains focused on what "Congress intended."  *Id.* at 12, 17.

19

1. Starting with the first factor, channeling this claim would preclude "*meaningful*" judicial review.[9] *Axon*, 598 U.S. at 190 (emphasis added). Whether ultimate judicial review is "meaningful" depends on "the interaction between the alleged injury and the timing of review." *Id.* at 191. Here, there is a mismatch. Consistent with Congress's goals, the alleged harms in this case center on protecting VOA's "vital mission" to serve as a credible source of "accurate, objective, and comprehensive news." JA38. Protecting VOA's mission is the *entire purpose* for the statute at issue—enforcement of which, Defendants claim, Congress intended to channel to an administrative agency.

But, as explained above, if Abramowitz's claim is channeled, it could be years before Abramowitz can be reinstated. Defendants will have gotten away with doing the exact thing Congress meant to prevent. And by the time Abramowitz is reinstated, the damage to VOA's mission—the very thing he has sued to protect, *see* JA21—will be done. So while Defendants point out that "review of agency rulings is available in the Federal Circuit" (Br. 24), by then judicial review "would come too late to be meaningful," *Axon*, 598 U.S. at 191.

---

[9] The District Court concluded otherwise on this first factor but held that, since the other two factors cut against channeling, "[o]n balance, these considerations indicate that Congress did not intend to channel Abramowitz's removal claim." JA93-95.

2. Abramowitz's claim is also wholly collateral to the CSRA review scheme, as the District Court concluded. JA94-95. This factor "requires considering the nature of the claim," giving an administrative agency "a heightened role in the matters it customarily handles." *Axon,* 598 U.S. at 186, 194. As the District Court pointed out, the "nature of the claim" is an attempt to enforce a "specialized" removal statute applicable to only a "handful" of senior USAGM employees. JA94. Defendants' sole defense on the merits is that the statute unconstitutionally insulates the VOA director from presidential control under Article II. These issues "have nothing to do with the enforcement-related matters" the MSPB "regularly adjudicate[s]." *Axon*, 598 U.S. at 193. The MSPB has *never* "adjudicate[d]" a challenge involving § 6205(e), the statutory provision at issue. And "the sorts of procedural or evidentiary matters an agency often resolves on its way to a merits decision" are also not at issue. *Id.* No meaningful facts are in dispute. Congress did not, by sending mine-run employment disputes to the MSPB, implicitly strip federal district courts of their jurisdiction to answer "fundamental" constitutional questions. *Id.* at 180, 185.

In retort, Defendants point to language in *Elgin* rejecting an assertion that "facial and as-applied constitutional challenges to statutes may be brought in district court." Br. 26 (quoting *Elgin v. Dep't of Treasury*, 567 U.S. 1, 15 (2012)). But, critically, this language, and other similar language Defendants cite from

21

*Elgin*, dealt with a different step in the *Thunder Basin* analysis. *See Elgin*, 567 U.S. at 10-15 (Section IV). In *Elgin*, petitioners sought at step one—which, recall, is about whether the review scheme is the exclusive remedy for claims within its scope—to "carve out an exception to CSRA exclusivity" for constitutional challenges. *Id.* at 12.

On step two, *Elgin* is no impediment to courts' jurisdiction. As the District Court pointed out, *Elgin*, unlike this case, dealt with "mine-run federal employee[s]." JA94. Nor, as the District Court said, "does Abramowitz dispute the defendants' proffered reasons for firing him or challenge an underlying USAGM employment policy akin to the Selective Service registration penalty in *Elgin*." JA94. And while Defendants argue that, "[u]nder *Elgin*," all "constitutional issues are appropriate for agency adjudication," (Br. 26), that is plainly not true, as the Supreme Court established in *Axon*. There, the Supreme Court expressly held that an assertion that government officials "were unconstitutionally insulated from presidential control"—exactly as Defendants argue here—was "wholly collateral" and need not be subject to agency adjudication. 598 U.S. at 186, 188, 192-93.

3. The issues in this case also fall "outside the agency's expertise." *Thunder Basin*, 510 U.S. at 212. On this score, the Supreme Court "could hardly be clearer." *Axon*, 598 U.S. at 194. Agencies have no expertise in "[c]laims that

tenure protections violate Article II." *Id.*; *see also Free Enter. Fund*, 561 U.S. at 491. While agencies may "know[] a good deal" about the things within their domain, they know "nothing special about the separation of powers." *Axon*, 598 U.S. at 194. The same is true of "standard questions of administrative law," *Free Enter. Fund*, 561 U.S. at 491, including whether an agency violated the APA by ignoring a statute—the exact issue here.

Defendants' primary retort again returns to *Elgin*, which involved constitutional issues. Br. 24-28. But that case involved other issues too, clearly within the agencies' expertise. There were "many threshold questions," including some "unique to the employment context," "to which the MSPB can apply its expertise." *Elgin*, 567 U.S. at 22-23; *see also Axon*, 598 U.S. at 195 (describing *Elgin* as a case in which the "constitutional claims" were "intertwined with or embedded in matters on which the Commissions are expert"). And ruling on those grounds could "obviate the need" to address the constitutional questions. *Elgin*, 567 U.S. at 22.

Not so here. There are no "technical considerations of [agency] policy" at play, *Free Enter. Fund*, 561 U.S. at 491, and Defendants do not argue otherwise. *See generally* Br. 27-28. Whether raised in the complaint or as a defense, *see* Br. 25, the *only* issues at play fall outside the agencies' expertise. There is nothing the agency "can apply distinctive knowledge to." *Axon*, 598 U.S. at 186. There

is nothing upon which the agency's expertise can be "brought to bear." *Elgin*, 567 U.S. at 23.

4. In addition to the arguments addressed above, Defendants make two general points. First, Defendants contend that *Axon* does not control because Abramowitz is not "challenging the constitutionality of the MPSB or OSC process." Br. 30. But pointing to some factual variation does not give "the Government" license to ignore *Axon*'s "reasoning." *Axon*, 598 U.S. at 193-94. That is particularly true in "apply[ing] the *Thunder Basin* factors," where "variations" in the statutory schemes will undoubtedly lead the analysis to "differ[] in some particulars," even when it "come[s] out in the same place." *Id.* at 189.

Second, Defendants argue repeatedly that this Court already decided the issue in its interim order in *Widakuswara*. Br. 1, 21-23, 29. But the motion panel's stay decision never addressed the core question in *this* separate appeal. Rather, the *Widakuswara* motions panel considered a challenge to the "wholesale shuttering of VOA," which involved the placement of "over 1,000 employees on administrative leave" and the termination of "nearly 600 personal-service contractors." *Widakuswara v. Lake*, No. 25-5145, 2025 WL 1288817, at *1-3 (D.C. Cir. May 3, 2025). As the District Court explained, the "CSRA issue in *Widakuswara* did not involve the targeted removal of a senior agency employee

24

subject to bespoke appointment and removal structures." JA108 n.2.  For that reason, nothing in that stay panel opinion considered whether Defendants' failure to abide by § 6205(e) for the VOA director, and the attendant constitutional questions, were channeled.  But that level of detail—whether the particular "*claims* are of the type Congress intended" to remove from federal court jurisdiction—is what the legal analysis requires.  *Thunder Basin*, 510 U.S. at 212 (emphasis added).

No panel of this Court, whether stay or merits, has yet considered the arguments surrounding § 6205(e)—a statute that applies to just a handful of network heads—raised in this appeal.  And in any event, even putting all that aside, the stay-posture decision in *Widakuswara* is not binding on this merits panel.

## II.     THE REMOVAL PROCESS CONGRESS ESTABLISHED IS CONSTITUTIONAL.

In enacting § 6205(e), Congress opted to place appointment and removal authority of the VOA director primarily in the hands of a presidentially appointed board of experts.  In doing so, Congress curtailed the authority of the USAGM CEO, who had previously held this authority unilaterally.

The CEO of USAGM (or those exercising that authority, *see supra* n.4) now want that power back.  And the basis Defendants assert is a violation of the

President's removal authority.  But Congress did not limit the authority of the President.  Both before and after this change, the VOA director is subject to removal at will by presidentially appointed officers who are themselves removable at will by the President.  That structure is perfectly consistent with the President's Article II power for two independent reasons.

First, removal is unrestricted.  Supreme Court precedent provides "two exceptions to the President's unrestricted removal power," which grant Congress the power to impose things like for-cause removal, which restrict the reasons an officer can be removed.  *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 204 (2020).  But there is no such restriction here.  For that reason, no "exception[] to the President's unrestricted removal power" is needed.  *Id.*

Second, even if the Court does view Congress's statute as a removal restriction that requires an exception, there is one.  All agree that the VOA director is an inferior officer.  Under the inferior-officer exception, Congress was thus free to restrict the VOA director's removal.  Although Defendants seek to place new restrictions on this exception based on dicta in a case about principal officers, as the District Court found, the Supreme Court's—and this Court's—precedent on inferior officers make clear that the exception applies to all inferior officers, including the VOA director.

26

## A.    Because There is No Removal Restriction, No Exception From Unrestricted Removal is Required.

1. Concerned about the CEO's ability to adhere to the principles underlying VOA's mission, Congress opted to relocate appointment and removal authority to a different executive branch entity, which qualifies as a "department head" under the Appointments Clause: the International Broadcasting Advisory Board.  The Board is an "independent establishment" that "exist[s] within the executive branch."  22 U.S.C. § 6205(a); 5 U.S.C. § 104.  It consists of seven members, six of whom are "appointed by the President, by and with advice and consent of the Senate."  22 U.S.C. § 6205(b)(1)(A).  The seventh member is the Secretary of State.  *Id.*  § 6205(b)(1)(B).  Of these seven members, a majority—three of the ones appointed and the Secretary of State—can be from the President's own party.  *Id.* § 6205(b)(3).

To carry out its mission, the Board is given an Executive Secretary and "such administrative staff and support as may be necessary."  *Id.* § 6205(h).  This mission includes a broad directive to improve the operation of the U.S. Agency for Global Media, including VOA.

For instance, the Board has oversight responsibility for the process around USAGM's grants to major media entities that promote editorially independent and rigorous journalism abroad—a key function of USAGM.  Grantees may not be

27

suspended "unless" the Board "determines that the" relevant "criteria … have been met." *Id.* § 6205(f)(2). The same goes for a final determination that the grantee should be debarred. *Id.* § 6205(f)(3). The Board is designated as the "debarring official," *id.* § 6205(f)(3), a designation reserved only for an agency head or the agency head's designee, 22 C.F.R. § 513.105.

Similarly, the Board is directed to ensure that the organization is run appropriately. To do this, the Board is empowered to "obtain information from the Chief Executive Officer" in order to "report" to specified "congressional committees" the Board's views on "improving the effectiveness and efficiency of the United States Agency for Global Media and its programming." 22 U.S.C. § 6205(d)(3)-(4). In this oversight capacity, the Board is required to "meet" with the CEO regularly: "at least four times annually, including twice in person." *Id.* § 6205(d)(2).

And, critically for our purposes, Congress made the Board the entity primarily responsible for appointment and removal of the heads of USAGM's networks, including the VOA director. The Board has the power to "unilaterally remove any … head of network" with the vote of five members. *Id.* § 6205(e)(2). Alternatively, if someone else recommends "appoint[ing]" or "remov[ing]" the "head[] of Voice of America," a "majority vote of the … Board" is required to "approve[]" that action before it can be final and effective. *Id.* § 6205(e)(1).

28

(Although Congress did not specify which entity would make recommendations to the Board, one can infer that Congress thought that a recommendation could come from the CEO.)  But an unbroken line of Supreme Court caselaw makes clear that it is the entity that gives final "approv[al]"—here the Board—in which the appointment power is constitutionally vested, not the entity that makes the initial recommendation.  *Free Enter. Fund*, 561 U.S. at 512 n.13 (collecting cases); *see also infra* at 34-37.

Congress's decision to vest appointment and removal power in the Board follows precisely the power the Constitution gave it.  Under the Appointments Clause, "Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments."  U.S. Const. art. II, § 2.  And when Congress vests the appointment of an inferior officer "in heads of departments … it is ordinarily the department head, rather than the President, who enjoys the power of removal."  *Free Enter. Fund*, 561 U.S. at 493.

That is what Congress has done here: placed removal of an inferior officer (the VOA director) in the hands of a head of department (the Board).  Defendants do not dispute these core tenets.  The VOA director is "undisputedly an inferior officer."  Br. 32.  And Defendants do not challenge that the Board "could be viewed as a department head" for under the text of the Appointments Clause.  *Id.*

29

at 33; *see also* JA109 n.4 (the District Court noted that any argument that the "Board does not qualify as a Head of Department under the Appointments Clause … is doubly waived"). That is because the Board is its own agency in the executive branch, with statutory responsibilities and staff, and the presidentially appointed members are its head. *See* 22 U.S.C. § 6205(a); 5 U.S.C. § 104.

There is no removal restriction in this statutory scheme. As Defendants posit, "the threshold inquiry is whether … a department head acting on the President's behalf has the power to remove an inferior officer." Br. 36. Here, a department head does. The VOA director is removable at will by the Board. Every single member of the Board is removable at will by the President. (So is the CEO, to the degree she plays a role.) Because removal power is unrestricted, no exception from "unrestricted removal power" is needed. *Seila L.*, 591 U.S. at 204.

2. Defendants nevertheless want back the unilateral removal authority Congress placed elsewhere, arguing that the Congress's removal statute should be viewed as an unconstitutional restriction on the President's authority. They raise three primary points.

a. First, while Defendants do not challenge that the Board qualifies as "Head of Department" under the Appointments Clause, they argue that Congress cannot have placed hiring and firing authority in the Board because the "CEO—

not the Advisory Board—is the head of [USAGM]." Br. 32. Although not express in their papers, Defendants' argument seems to be that only the head of the *particular* department that employs the inferior officer directly can be given the power to appoint and remove that officer.

But that limitation appears nowhere in the text, history, or tradition of the Appointments Clause. "The relevant language of the Appointments Clause is worth repeating" now, just as it was when courts have faced prior atextual attempts to limit Congress's power. *Morrison v. Olson*, 487 U.S. 654, 673 (1988). In language known as the "excepting clause," the founders placed in "Congress" the power to "vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2. This text—and Defendants must agree that text is paramount—refers only to "Heads of Departments," both plural and without limitation.

Here, it is uncontested that the Board is a department head. It is also a department head with oversight responsibility for USAGM, the entity that employs the VOA director. *See supra* at 27-29. That the Board technically exists as a separate department from USAGM does not alter the constitutional analysis. There is nothing in the text or logic of the Appointments Clause that requires the appointing official to be in the same agency as the appointed inferior officer. In

31

fact, the Supreme Court has held just that expressly. In reading this excepting clause, the Supreme Court concluded that "there is no absolute requirement … in the Constitution" to "vest the appointment of inferior officers … in that particular executive department to which the duties of such officers appertain." *Ex parte Siebold*, 100 U.S. 371, 397 (1879).

Following this analysis, the Supreme Court has previously rejected attempts to impose atextual limits on Congress's constitutional authority. In *Morrison*, Congress created a "Special Division" of the court of appeals "for the purpose of appointing independent counsels," who were employees of the Department of Justice. 487 U.S. at 661. Appellees challenged this arrangement, arguing that the excepting clause does not allow Congress to make an "interbranch appointment[]." *Id.* at 673. The Supreme Court rejected this argument, holding that "the language of th[e] 'excepting clause' admits of no limitation on interbranch appointments." *Id.* Same here. Just as the "excepting clause" places no limitation on interbranch appointments, its text "admits of no limitation on" *intra*branch "appointments." *Id.*

In addition to the lack of textual hook for Defendants' contrary assertion, that assertion also faces a logical hurdle. Interbranch appointments can raise "separation-of-powers concerns." *Id.* at 675. Not so for intrabranch appointments, in which power is housed solely within the executive branch, with

32

the appointment power given only to individuals directly accountable to the President. Nor can there be any logical "incongruity" (*id.* at 676) between the appointer and the appointee, where the relationship between USAGM and the Board is so close. As explained above, the Board is given a direct oversight role of USAGM. The Constitution simply does not impose the limitation on Congress's power that Defendants posit.

That lack of limitation in the excepting clause is no oversight by the Founders. In the excepting clause, they intended to grant Congress discretion— "the inclusion of 'as they think proper'" in the text itself makes that clear. *Id.* at 673. As James Madison explained, "it is in the discretion of the Legislature to say upon what terms the office shall be held, either during good behavior or during pleasure." 1 Annals of Congress 389-90 (1789) (Joseph Gales ed., 1834). It has long been understood that the Constitution vests in Congress the power to set up procedures "as it deems best for the public interest." *United States v. Perkins*, 116 U.S. 483, 485 (1886). That discretion allows Congress to decide, as it did here, to place appointment and removal authority in someone other than the inferior officer's direct boss.

b. Second, Defendants argue that Congress's statute gives both the USAGM CEO and the Board a role, and that this structure is "novel" and "diffuses

33

the removal power more broadly than Article II permits."  Br. 20; *see also id.* 33-34, 36.

But for starters, Congress set out two removal routes, and in one it gave the Board "unilateral[]" authority to remove a network head with five votes.  22 U.S.C. § 6205(e)(2).  That power is the Board's alone; the CEO plays no role.

Defendants are focused on the other mechanism for removal, in which the Board is required to "approve[]" a decision to remove the VOA director initiated by someone else, presumably the CEO, although the statute does not specify.  *Id.* § 6205(e)(1).  But there is nothing "diffuse" or "novel" about this approval structure.  Br. 33-36.  In fact, a line of cases dating over 150 years back upholds, under the Appointments Clause, the appointment of an inferior officer made by someone *other* than the authorizing department head, so long as the department head is charged with approving the decision.  *See Free Enter. Fund*, 561 U.S. at 512 n.13 (collecting cases).  In this circumstance, "the department head's *approval*"—exactly what Congress required of the Board in § 6205(e)(1)—"satisfies the Appointments Clause."  *Id.* (emphasis added).  That is because, for the purpose of the Appointments Clause, appointment and removal is "vested" in the entity with final "approval" authority.  *See id.*

For example, in *United States v. Hartwell*, the Supreme Court held in 1867 that a Treasury officer was validly appointed, even though the selection was

conducted by "the assistant treasurer." 73 U.S. 385, 388 (1867). That is because

the selection was then finalized "with the approbation of the Secretary of the

Treasury," which the Court deemed sufficient to satisfy the Appointments Clause.

*Id.* at 385, 388. More recently, in *Free Enterprise Fund*, the Supreme Court held

that the heads of major Securities and Exchange Commission (SEC)

administrative units, appointed "directly by the Chairman," satisfied the

Appointments Clause because they were then "subject to the approval of the

Commission," the entity that qualifies as the department head. *Free Enter. Fund*,

561 U.S. at 512 n.13. In none of these cases did the Court suggest that the

involvement of two separate entities unconstitutionally "diffused" power, or that

Congress's decision to involve two entities in appointment or removal was

"novel." Br. 20, 33-34, 36-37. In fact, as the Supreme Court recognized, finding

this shared-appointment responsibility scheme unconstitutional would "invalidate

numerous appointments" across government,[10] something it declined to do. *Free*

---

[10] This appointment format, in which a department head approves a decision made by another, is common. *See e.g.*, *Federal Reserve*, 12 U.S.C. §§ 304, 305, 341 (the Reserve Bank presidents that sit on the Federal Open Market Committee, which sets monetary policy, are initially selected by two classes of the directors of that Reserve Bank, with the approval of the Board of Governors); *Commodities Futures Trading Commission*, 7 U.S.C. § 2 (a)(6)(C) ("The appointment by the Chairman of the heads of major administrative units under the Commission shall be subject to the approval of the Commission."); *Consumer Product Safety Commission*, 15 U.S.C. § 2053(g)(1)(A) ("The Chairman, subject

*Enter. Fund*, 561 U.S. at 512 n.13; *see also Silver v. U.S. Postal Serv.*, 951 F.2d 1033, 1038 (9th Cir. 1991) (holding that an appointment scheme in which two entities—the Post Office Board of Governors and the Postmaster General—"jointly appoint and have the joint power to remove the Deputy Postmaster General," an inferior officer, "conforms with the requirements of the Appointments Clause and is therefore constitutional").

The same type of structure exists here.  Even if Congress contemplated that the CEO would make the initial recommendation to appoint or remove the VOA director, Congress *required* that this decision be "approved" by the Board.  22 U.S.C. § 6205(e)(2).  Following the Supreme Court's analysis, the appointment and removal power is thus, for constitutional purposes, vested in the Board.

There is perhaps one difference between this circumstance and the long and unbroken line of cases mentioned above.  In many of those cases, the initial decision was made by a subordinate, while here, the statute appears to envision that the recommendation will be made by USAGM's CEO.  But that difference only *increases* accountability to the President—and thus *decreases* any possible

---

to the approval of the Commission, shall appoint as officers of the Commission an Executive Director, a General Counsel," and nine other listed officers); *Farm Credit Administration*, 12 U.S.C. § 2245(b) ("The appointment by the Chairman of the heads of major administrative divisions under the Board shall be subject to the approval of the Board.").

"burden [on] the President's Article II powers."  Br. 43.  Unlike a subordinate to a department head, who is insulated from Presidential supervision, the USAGM CEO is answerable directly to the President and removable by him at will. Congress's scheme is thus in no way an "impediment to the President's oversight of the Executive Branch."  *Seila L.*, 591 U.S. at 215.  Perhaps for this reason, the Supreme Court has also blessed schemes in which a commission Chairman (who is not a department head) makes an appointment that is then approved by the full Commission (which is).  *See Free Enter. Fund*, 561 U.S. at 512 n.13.

c. Third, Defendants argue that there is in fact a removal restriction.  They say that it is a "significant burden" on the President to be "required to appoint—and win Senate confirmation for—an all-new Board just to remove an inferior officer" (although, in this case, the President has apparently made no effort to appoint a new board).  Br. 36.  What Defendants seem to be challenging is the basic concept of placing removal power of an inferior officer in a multi-member board.  That position cannot be right.  In fact, that scheme was upheld in *Free Enterprise Fund.  See* 561 U.S. at 509 (allowing the SEC to remove inferior officers without for-cause removal).  And that structure exists throughout

government.[11]  Many of these multi-member boards, like the one at issue here,

have requirements to be politically balanced.[12]  If Defendants were right, and the

"burden" of being "required to appoint" a Board and be in the "presence of

---

[11] *See, e.g.*, 12 U.S.C. §§ 304, 305, 341 (the Reserve Bank presidents that sit on the Federal Open Market Committee, which sets monetary policy, are initially selected by two classes of the directors of that Reserve Bank, with the approval of the Board of Governors); 47 U.S.C. § 154(f)(1) (the Federal Communications Commission "shall have authority … to appoint such officers … as are necessary in the exercise of its functions"); 7 U.S.C. § 2 (a)(4)-(6) (the general counsel, executive director, and heads of major administrative units are either appointed and removed by the Commodities Futures Trading Commission directly, or by the Chairman and subject to the approval of the Commission); 12 U.S.C. § 1819 (the Board of Directors of the Federal Deposit Insurance Corporation has the authority to "appoint … such officers … and to dismiss at pleasure such officers"); 29 U.S.C. § 154(a) (the National Labor Relations Board "shall appoint an executive secretary"); 52 U.S.C. § 30106(f)(1) (the Federal Election Commission "shall have a staff director and a general counsel who shall be appointed by the Commission"); 5 U.S.C. § 7105(d) (the Federal Labor Relations Authority "shall appoint an Executive Director and such regional directors, administrative law judges …, and other individuals as it may from time to time find necessary for the proper performance of its functions"); 15 U.S.C. § 2053(g)(1)(A) (the Chairman of Consumer Product Safety Commission, "subject to the approval of the Commission, shall appoint as officers of the Commission" eleven listed officers); 12 U.S.C. § 635a(c)(7) (the Board of Directors of the Export-Import Bank "shall … designate the vice presidents and other officers of the Bank and prescribe their duties"); 12 U.S.C. § 2245(b) ("The appointment by the Chairman" of the Board of the Farm Credit Administration "of the heads of major administrative divisions under the Board shall be subject to the approval of the Board.").

[12] *See, e.g.*, 52 U.S.C. § 30106(a)(1) (Federal Election Commission); 7 U.S.C. § 2 (a)(2)(A) (Commodities Futures Trading Commission); 15 U.S.C. § 2053(c) (Consumer Product Safety Commission); 12 U.S.C. § 2242(a) (Farm Credit Administration); 12 U.S.C. § 635a(c)(2) (Export-Import Bank); 5 U.S.C. § 7104(a) (Federal Labor Relations Authority).

members of the opposition party" were enough to violate the President's Article II powers, it would unravel agencies across government and bring their work to a halt.

But that is not the law. Never has a court suggested that placing removal power in multi-member board is categorically unconstitutional. Nor has this Court ever ruled that a requirement for political balance is unconstitutional. To the contrary, this Court and the Supreme Court have made clear that it's not. That structure—placing hiring and firing authority in a multi-member bipartisan entity—time and again, has been found constitutional. *See, e.g.*, *Free Enter. Fund*, 561 U.S. at 509; *Aviel v. Gor*, No. 25-5105, 2025 WL 1600446, at \*1 (D.C. Cir. June 5, 2025).

## B.    Even if an Exception is Required, the VOA Director is an Inferior Officer Subject to the Inferior-Officer Exception.

1. But even if Defendants were right and § 6205(e) is viewed as a "removal restriction," Congress had every right to impose one. The Supreme Court has made clear that one "limit" on the President's authority to remove officers applies to "inferior" officers, whose removal Congress may restrict. *Free Enter. Fund*, 561 U.S. at 483, 493, 502. "We have no doubt," the Court held, "that when congress, by law, vests the appointment of inferior officers in the heads of departments, it may limit and restrict the power of removal as it deems best for

39

the public interest." *Perkins*, 116 U.S. at 485; *see also id.* ("The constitutional authority in congress to thus vest the appointment implies authority to limit, restrict, and regulate the removal by such laws as congress may enact in relation to the officers so appointed."). The VOA director is "undisputedly an inferior officer." Br. 32.

Congress believed that an independent, expert board's participation was necessary to protect VOA's mission and independence, features critical to its public interest function of providing impartial, independent journalism. 22 U.S.C. §§ 6201(4), 6202(a)(5), (b)(1), (c)(1). Congress could have protected the VOA director from arbitrary removal by imposing a for-cause standard—something the Supreme Court has often blessed for inferior officers. *See Free Enter. Fund*, 561 U.S. at 493 ("This Court has upheld for-cause limitations on th[e] [removal] power as well."). But instead, it took a different approach, and one that poses even less of an "impediment" on the Article II removal power (Br. 37), by keeping at-will removal but requiring a vote of the Board—itself an entity subject to direct, unrestricted Presidential oversight. Defendants have pointed to no authority preventing Congress from giving an executive branch board this power.

In fact, Congress's removal scheme closely tracks those the Supreme Court has endorsed. In *Free Enterprise Fund*, after finding double-layer for-cause removal unconstitutional, the Supreme Court expressly blessed a scheme in which

40

the inferior officers were "removable by the Commission at will" leaving "the President separated from [the inferior officers] by only a single level of good-cause tenure." 561 U.S. at 509. In this scheme, the inferior officers "are no less subject than the Commission's own functions to Presidential oversight." *Id.* So too here: The VOA director is subject to direct Presidential oversight through the Board.

What is more, the Board, unlike the SEC, enjoys no for-cause removal protection. To use Defendants' manner of analysis (Br. 36-37), to replace an inferior officer in the *Free Enterprise Fund*-blessed scheme, a President would first need to have cause to fire members of the SEC and would then need to appoint a new Commission. But here, there is no need to find that cause. The President's path to replacing an inferior officer is more direct. It is difficult to see how the Board's role could ever be an unconstitutional infringement on the President's Article II authority, if the SEC's role in *Free Enterprise Fund* is not.

2. In retort, Defendants make one argument. They argue that the inferior-officer exception only applies to inferior officers "with limited duties and no policymaking or administrative authority." Br. 34-35. For this proposition, Defendants rely on a single line of dicta from *Seila Law*—a case not about inferior officers at all, but in which "[e]veryone agree[d]" that the official at issue was a

41

principal officer. *Seila L.*, 591 U.S. at 219. For three reasons, the law is not what Defendants say.

First, Defendants' limitation appears nowhere in the constitutional text, which speaks only of "inferior officers," without subdividing them into two classes subject to different rules. U.S. Const. art. II, § 2, cl. 2. It is that text from which the inferior-officer exception derives.

Second, Defendants' interpretation would nullify the exception totally, rendering inferior officers throughout the government unconstitutionally appointed. The law sets out a "basic framework for distinguishing between officers" (whose appointment must comport with the Appointments Clause) "and employees" (whose appointments do not). *Lucia v. S.E.C.*, 585 U.S. 237, 245 (2018). A central part of this test asks whether the individual "exercis[es] significant authority pursuant to the laws of the United States." *Id.* (quoting *Buckley v. Valeo*, 424 U.S. 1, 126 (1976)). By definition, therefore, *every* inferior officer must exercise "significant authority"—if they didn't, they wouldn't be an officer at all, but an employee. So if the inferior-officer exception was off limits for any officer exercising "policymaking or administrative authority" (Br. 34-35), nobody would be left. Every tenure protection for every inferior officers across government—and there are many—would be unconstitutional. The consequences would be vast. For example, the Reserve Bank members of the Federal Open

42

Market Committee would all be unconstitutionally appointed because their appointment and removal are placed with the Board of Governors of the Federal Reserve, who all enjoy for-cause removal. 12 U.S.C. § 242; *see also Appointment and Removal of Federal Reserve Bank Members of the FOMC*, 43 Op. O.L.C. 263, 269 (2019) (finding the appointment and removal statute constitutional).

Third, and fortunately for the operation of government, the law is not what Defendants say it is. While Congress does not hide elephants in mouseholes, neither does the Supreme Court. It did not halt the work of inferior officers across government with a single line in a case about principal officers.

Binding Supreme Court precedent concerning inferior officers confirms that the exception applies to those with both policymaking and administrative authority. *Free Enterprise Fund* dealt with an "inferior officer" that "determines the policy and enforces the laws of the United States"—someone thus ineligible for the inferior-officer exception under Defendants' test. 561 U.S. at 484. These inferior officers could only be removed for cause by the Securities and Exchange Commission, who, in turn, could only be removed for cause by the President. The Court made clear that each of these layers of removal was independently constitutional under the Court's precedents, *id.* at 483, 493, but it held that they could not be combined, *id.* at 484. As a remedy, the Court held that making the

43

inferior officers removable at will by the Commission, a bipartisan board with for-cause removal protections, solved the constitutional defect. *Id.* at 509

But if Defendants were right about the law, the first layer of protection—the inferior-officer specific removal protection—would be independently unconstitutional. The Supreme Court's entire analysis about the propriety of the double-layer removal would have been unnecessary. And the Supreme Court's remedy would still be unconstitutional, because the inferior officers retained policymaking authority and were removable by a department head protected by for-cause removal. But that is not what the Supreme Court held.

## III. COURTS HAVE THE POWER TO PREVENT DEFENDANTS' UNLAWFUL ACTION.

As the final step in their cascading efforts to avoid abiding by Congress's directive, Defendants argue that, even if they are wrong and the District Court had jurisdiction, and even if they are wrong and Congress's statute is constitutional, then courts still do not have power to afford meaningful relief. Courts, they say, "lack[] the authority to enjoin the removal of an executive officer" because it was not a remedy "'traditionally accorded by courts of equity' at our country's inception." Br. 37-38. So, according to Defendants, "[e]ven if Congress could restrict the removal of the VOA Director, a court may not issue an order blocking his removal." *Id.* at 38 (citation omitted).

44

In our system of government, with power distributed between three branches, Congress has the power to pass laws and courts have the power to enforce compliance with them.  The executive branch's argument takes all the power from the three branches for itself.  If this sounds wrong, that's because it is.  The law in the D.C. Circuit is settled on this point.  And there are particular reasons why, in the context of Abramowitz's case, Defendants' arguments asking for a departure are especially inapt.

### A.      D.C. Circuit Law is Settled on This Score.

In the D.C. Circuit, the law has been established for decades: "injunctive relief against subordinate officials" to the President is available to remedy the "violat[ion] [of] a duty to comply with removal restrictions contained in … statute."  *Swan v. Clinton*, 100 F.3d 973, 977-78 (D.C. Cir. 1996).  This authority vindicates a "bedrock principle": our "government is founded on the rule of law." *Id.* at 978.  And for that reason, "it is sometimes a necessary function of the judiciary to determine if the executive branch is abiding by the terms of legislative enactments." *Id.*

The D.C. Circuit's law has been repeatedly reaffirmed.  Just a couple years ago, this Court affirmed that "we can enjoin subordinate executive officials to reinstate a wrongly terminated official *de facto*."  *Severino v. Biden*, 71 F.4th 1038, 1042-43 (D.C. Cir. 2023) (cleaned up).  And again, in context of this

45

Administration's series of terminations in violation of removal restrictions, the en banc D.C. Circuit considered the issue in a stay posture. It concluded that the "government likewise has not shown a strong likelihood of success on the merits of its claim that there is no available remedy." *Harris v. Bessent*, No. 25-5037, 2025 WL 1021435, at *2 (D.C. Cir. Apr. 7, 2025) (en banc) (per curiam). Subsequent panels of the D.C. circuit—even those composed of members who dissented in the en banc court—have followed. "[I]t seems appropriate," Judge Katsas recently wrote, joined by Judge Pillard, "to defer to the views expressed by our *en banc* Court … [that] the government [is] unlikely to succeed in its contention that reinstatement is rarely if ever an available remedy for unlawfully removed officials." *Aviel*, 2025 WL 1600446, at *2 (Kastas, J., concurring).

Defendants do not discuss *Swan*, *Severino*, or *Aviel*. Instead of focusing on the current state of the D.C. Circuit's law, their primary argument is that this remedy was not "traditionally available in federal court." Br. 37-38, 40-43. For support, they rely on a series of old Supreme Court cases, which all predate *Swan*. But these early cases, which were equally available to that panel of this Court (or the en banc Court in *Harris*), did not change this Court's analysis, and for good reason.

Those cases pre-date the merger of law and equity, which is critical to understanding their holdings. While it was true that "a court of equity ha[d] no

jurisdiction over the appointment and removal of public officers," *In re Sawyer*, 124 U.S. 200, 212 (1888), that was only because that relief was available in courts of law, and a court of equity would not "invade the domain of the courts of common law," *White v. Berry*, 171 U.S. 366, 376 (1898). At the time, "courts of law' had established authority to "determine the title to a public office" through "*mandamus*" and "*quo warranto*" actions. *In re Sawyer*, 124 U.S. at 212; *White*, 171 U.S. at 377; *see also Marbury v. Madison*, 5 U.S. 137, 173 (1803) (concluding that there was "a plain case for mandamus" to restore a federal official who had been wrongfully removed from his post). The cases cited by Defendants do not, therefore, stand for the proposition that federal courts are powerless to restore a wrongfully removed employee to office; the cases just direct which type of court should do it.

Since the merger of law and equity, that distinction—*which* type of federal court is empowered to restore an officer to his or her rightful place—no longer matters. As the Supreme Court put it, "[m]uch water has flowed over the dam since 1898." *Sampson v. Murray*, 415 U.S. 61, 71 (1974). And since then, the Supreme Court's precedents "establish that federal courts do have authority to review the claim of a discharged governmental employee." *Id.* The Supreme Court thus concluded that district courts are "not totally without authority to grant interim injunctive relief to a discharged Government employee." *Id.* at 63.

Defendants' response is twofold. First, Defendants point out that, in the past, several plaintiffs have sought backpay as a remedy. Br. 39. But even if examples of other plaintiffs' choices were persuasive, many of the cases Defendants cite are not those examples. Defendants cite *Wiener* for the proposition that past plaintiffs have filed "suit 'for recovery of … salary.'" Br. 39 (citation omitted). But Wiener in fact sought to be restored to his position through a "quo warranto proceeding," relief that became "moot" when his Commission was abolished. *Wiener v. United States*, 357 U.S. 349, 351 (1958). Defendants also rely (at 39) on *Humphrey's Executor* as an example of a back pay case, but that case has the word "executor" in the title because Humphrey had passed away; he could not be reinstated. *Humphrey's Ex'r v. United States*, 295 U.S. 602, 612 (1935) (referring to "the decedent").

Second, Defendants rely on several dissents (Br. 38, 40, 41, 42) from the D.C. Circuit and the Supreme Court—highlighting that their view is not the governing law—and suggest that a majority of the Supreme Court will eventually agree with them. But that sort of tea-leaf reading is not how law is done. Both this Court (in *Swan* and *Severino*) and the Supreme Court (in *Sampson*) have established the availability of injunctive relief in the right circumstances. This Court remains bound by that rule, and "leav[es] to … [the Supreme] Court the

48

prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989).

### B.   Abramowitz's Case Presents Additional Reasons to Adhere to Settled Law.

There are several reasons that this is a particularly poor case to deviate from the D.C. Circuit's established law that injunctive relief is available for a wrongly removed government employee.

1. First, and critically, doing so would vitiate Congress's statute. When the CEO of USAGM, Michael Pack, unilaterally fired network heads in 2020, Congress worried that this sort of political firing risked the very mission of impartial news, and thus enacted a statute to ensure that it would never happen again. But in the Government's telling, this statute had very little effect. Defendants were in fact free to take the very action Congress prohibited, so long as they were willing to give backpay. Backpay is clearly not a sufficient deterrent to prevent Defendants from taking the exact action Congress prohibited—as the very fact that we are here makes clear. Defendants' argument that Congress has not authorized courts to impose a meaningful remedy does not make practical sense in this circumstance.

2. Defendants' main policy argument is that allowing reinstatement risks "substituting a court's judgment on a personnel issue for the Executive's." Br.

37-38. But that does not apply here—the Court would be enforcing the law, not reaching a policy judgment. To be sure, *Congress* has issued a judgment: that protecting the mission of VOA requires that a board of experts, housed within the executive branch, to have authority over the removal of the VOA director. But this Court only reaches the reinstatement issue if it has determined that Congress has the constitutional authority to make this judgment. The Court is then simply enforcing it, not making a judgment of its own. If the required executive branch officials—of which the Board is a part—decide they want a new director and vote to remove this one, nothing Abramowitz asks for in this suit prevents the exercise of this judgment.

While Defendants believe there is a separation-of-powers concern, it cuts in favor of a meaningful remedy. It is a "bedrock principle" of our constitutional structure that "a necessary function of the judiciary [is] to determine if the executive branch is abiding by the terms of legislative enactments." *Swan*, 100 F.3d at 978. Defendants ask for a rule that would allow them to ignore the legislative enactments of Congress.

3. In addition, unlike the other matters in which this issue has come up, the VOA director is an inferior officer, not a principal officer. This matters because Defendants' policy argument hinges on their contention that reinstatement "requires the President or the head of an agency to entrust executive power to

50

someone he or she has determined should not exercise it." Br. 38.  But an inferior officer is not entrusted with the same "executive power" a principal officer might be.

4. Finally, this case is *not* about reinstatement.  Abramowitz has never been removed.  This matters because, in Defendants' telling, one of the reasons not to allow a remedy is to avoid "the disruptive effect of the repeated removal and reinstatement of officers during the pendency of litigation."  Br. 42 (quoting *Trump v. Wilcox*, 145 S. Ct. 1415, 1415 (2025)).  But here, that goal is furthered by allowing an order that blocks removal, which avoids these "disruptive effects."

**CONCLUSION**

Faced with an agency action that, all agree, violated the express terms of a congressional mandate, the District Court did exactly what it was supposed to in our constitutional structure: It ordered the executive branch to comply with Congress's directive.  This Court should affirm.

51

February 27, 2026                          Respectfully submitted,

                                           */s/ William B. Schultz*
                                           William B. Schultz
                                           Jacobus P. van der Ven
                                           Brian J. Beaton, Jr.
                                           ZUCKERMAN SPAEDER LLP
                                           2100 L Street NW, Suite 400
                                           Washington, DC 20037
                                           Tel: (202) 778-1800
                                           Fax: (202) 822-8136
                                           wschultz@zuckerman.com
                                           cvanderven@zuckerman.com
                                           bbeaton@zuckerman.com

                                           *Attorneys for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the applicable type-volume limitation set forth in Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,532 words, excluding the portions of the brief exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(f).

I further certify that this brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared using Microsoft Word Office in a proportionally spaced typeface (Times New Roman, 14 point).

/s/ *William B. Schultz*
William B. Schultz

## CERTIFICATE OF SERVICE

I hereby certify that, on February 27, 2026, I caused to be filed electronically the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

/s/ *William B. Schultz*
William B. Schultz