# United States Court of Appeals
FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued April 23, 2026 Decided November 10, 2026

No. 25-5314

MICHAEL ABRAMOWITZ, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF VOICE OF AMERICA, ET AL.,
APPELLEES

v.

KARI LAKE, IN HER OFFICIAL CAPACITY AS SENIOR ADVISOR TO THE ACTING CEO OF THE UNITED STATES AGENCY FOR GLOBAL MEDIA, ET AL.,
APPELLANTS

Appeal from the United States District Court
for the District of Columbia
(No. 1:25-cv-00887)

*Elizabeth T. Hedges*, Attorney, U.S. Department of Justice, argued the cause for appellants. With her on the briefs were *Brett A. Shumate*, Assistant Attorney General, *Yaakov M. Roth*, Principal Deputy Assistant Attorney General, and *John Bailey* and *Abigail Stout*, Attorneys.

*William B. Schultz* argued the cause for appellees. On the brief were *Jacobus P. van der Ven* and *Brian J. Beaton, Jr.* *Margaret Dotzel* entered an appearance.

Before: SRINIVASAN, *Chief Judge*, PILLARD and PAN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

PILLARD, *Circuit Judge*: Seeking to preserve the journalistic integrity of the news broadcasters within the U.S. Agency for Global Media, Congress empowered a separate agency, the International Broadcasting Advisory Board, with final authority over the hiring and firing of the broadcasters' heads-of-network. The leaders of the Agency for Global Media ignored that statute when they attempted unilaterally to fire Michael Abramowitz, the head of Voice of America. Abramowitz sued, and the district court permanently enjoined the Agency for Global Media from removing Abramowitz without the International Broadcasting Advisory Board's approval.

We affirm the injunction. The district court had jurisdiction to enforce the statutory requirements governing the Voice of America directorship. Those statutory requirements are consistent with Article II. And the district court had equitable power to enjoin defendants from effectuating the illegal termination.

## I.

### A.

Congress has charged the U.S. Agency for Global Media (the Agency) to "use broadcasting to support freedom and democracy in a rapidly changing international environment." 22 U.S.C. § 6201(5). To carry out that mission, Congress placed within the Agency six federally funded international news broadcasters that "export[] the cardinal American values of free speech, freedom of the press, and open debate to the

dark corners of the world where independent, objective coverage of current events is otherwise unavailable." *Widakuswara v. Lake*, 779 F. Supp. 3d 10, 19-20 (D.D.C. 2025) (citation omitted).

Voice of America is the flagship international broadcaster of the United States. The United States created Voice of America during World War II to counter Nazi propaganda in Europe with free, fact-based reporting. Voice of America's congressionally codified charter dictates that it serve the "long-range interests of the United States" by directly providing "accurate, objective, and comprehensive" news to listeners around the globe. 22 U.S.C. § 6202(c). Congress explained that, "[t]o be effective, the Voice of America must win the attention and respect of listeners." *Id.* And it has. During its eighty-plus years of broadcasting, Voice of America has "cultivated an audience of 425 million listeners who rely on [its] output—particularly in areas of the world where a free press is otherwise unavailable." *Widakuswara*, 779 F. Supp. 3d at 34. Congress has directed the Agency to sponsor other regional news networks as non-governmental, not-for-profit entities supported with appropriated funds via grant agreements, *see* 22 U.S.C. §§ 6207-6209, 6215, but Voice of America remains the largest of the Agency's broadcasters.

By statute, the Agency for Global Media's Chief Executive Officer is a presidential appointee who "supervise[s] all broadcasting activities" and logistical needs of the Agency. *Id.* §§ 6203(b)(1), 6204(a). (The position is currently occupied by an Acting CEO pending confirmation of the nominee.) "[I]n carrying out [those] functions," the CEO is required to "respect the professional independence and integrity of" each of the Agency's "broadcasting services." *Id.* § 6204(b). The CEO once held unilateral authority to appoint and remove the heads of Agency broadcasters. In 2020, however, the Agency's then-

CEO, Michael Pack, sparked bipartisan congressional outrage when he "unilaterally fired the heads of several networks," jeopardizing the broadcasters' "credibility and independence." *Abramowitz v. Lake*, 803 F. Supp. 3d 1, 6 (D.D.C. 2025) (quoting Letter from Sens. Rubio, Graham, Moran, Collins, Durbin, Leahy, and Van Hollen to Michael Pack, CEO, USAGM (July 1, 2020), at 1).

Following that episode, Congress converted the Agency's advisory board, the International Broadcasting Advisory Board (the Broadcasting Board), into a separate, independent agency with stronger oversight powers. *See* Pub. L. No. 116-283, § 1299Q, 134 Stat. 3388, 4022-24 (2021). First, Congress overhauled the structure and composition of the Broadcasting Board. Congress recreated it as a partisan-balanced independent agency composed of seven members requiring Senate confirmation. 22 U.S.C. §§ 6205(a), (b)(1), (b)(3), (b)(4)(A) (2021). Second, Congress gave the Broadcasting Board additional responsibilities to advise and oversee the Agency for Global Media. The Board now meets at least quarterly with the Agency CEO, reports on the Agency to Congress, and "advise[s] the [Agency CEO] to ensure" that he "fully respects the professional integrity and editorial independence" of the broadcasters. *Id.* § 6205(d). Third, Congress vested the Broadcasting Board with control over the hiring and firing of the six network heads, including the head of Voice of America. The CEO may make recommendations, but network heads "may only be appointed or removed if such action has been approved by a majority vote of the [Broadcasting] Board." *Id.* § 6205(e)(1). And the Board may itself "unilaterally remove any . . . head of network" by a vote of "five or more" out of its seven members. *Id.* § 6205(e)(2).

**B.**

Michael Abramowitz is the head of Voice of America. He was appointed in April 2024 with the unanimous approval of the Broadcasting Board.

President Trump, upon assuming office in January 2025, fired six of the seven members of the Broadcasting Board. He then issued an executive order directing that the Agency's "non-statutory components and functions . . . be eliminated to the maximum extent consistent with applicable law." Exec. Order No. 14,238, § 2(a), 90 Fed. Reg. 13043 (Mar. 14, 2025). Defendants—the Agency, then-Acting CEO Victor Morales, and then-Senior Advisor to the Acting CEO Kari Lake—promptly took action to implement the executive order. They placed Abramowitz and approximately 1,300 other Voice of America employees on indefinite administrative leave. *Abramowitz*, 803 F. Supp. 3d at 7.

Abramowitz and three Voice of America journalists filed suit requesting emergency injunctive relief. *Id.* The district court granted preliminary injunctions, *id.* at 8; *see Abramowitz v. Lake*, No. 25-cv-887, 2025 WL 1176796, at *2 (D.D.C. Apr. 22, 2025); *Widakuswara v. Lake*, 779 F. Supp. 3d 10, 40 (D.D.C. 2025), which a divided panel of this court stayed in part pending the Agency's appeal. *See Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817, at *2 (D.C. Cir. May 3, 2025). Because the Agency did not appeal the third part of the *Widakuswara* preliminary injunction, which required restoration of Voice of America's programming, the panel's stay did not affect that relief. Our full court reconsidered *en banc* the stay order, which halted preliminary injunctions in five related cases concerning the Agency for Global Media's networks, and we largely lifted the stay. *See Widakuswara v. Lake*, No. 25-5144, 2025 WL 1521355, at *1 (D.C. Cir. May

28, 2025) (en banc). But the *en banc* court did not disturb the stay of the injunction in Abramowitz's suit because the district court retained authority to enforce that injunction's un-appealed and unstayed third part directing the Agency to restore Voice of America's programming. *See Widakuswara v. Lake*, No. 25-5144, 2025 WL 2787974, at *1 (D.C. Cir. May 28, 2025) (en banc) (statement of Srinivasan, J.); *see also Abramowitz v. Lake*, 803 F. Supp. 3d at 8 (proceeding to grant partial summary judgment and a permanent injunction under the APA).

In July, with the Board inquorate, defendants sent Abramowitz a notice stating that he would be "reassigned" out of his position as head of Voice of America "to a role as Chief Management Officer in Greenville, North Carolina." *Abramowitz*, 803 F. Supp. 3d at 7. Unless Abramowitz promptly accepted the reassignment, the notice warned, "he would be removed" from his head-of-network post. *Id.* Abramowitz did not accept. After the deadline expired, defendants sent another letter, dated August 1, 2025, informing Abramowitz that they "had made the decision to remove him" due to his refusal of reassignment. *Id.*

Abramowitz moved for partial summary judgment. He argued that defendants violated the Administrative Procedure Act (APA), 5 U.S.C. §§ 551 *et seq.*, and acted *ultra vires* when they attempted to remove him in violation of section 6205.

The district court granted partial summary judgment on the APA claim and entered a permanent injunction barring defendants "from removing Plaintiff Abramowitz from his position as [head] of Voice of America without the approval of a majority of the [Broadcasting Board]." Order, No. 25-cv-887 (D.D.C. Aug. 28, 2025) (J.A. 81). The district court concluded that Abramowitz's suit fell within its federal-question

jurisdiction. *Abramowitz*, 803 F. Supp. 3d at 10-11; *see* 28 U.S.C. § 1331. And it held that defendants' removal of Abramowitz without the Broadcasting Board's approval was contrary to law. *Abramowitz*, 803 F. Supp. 3d at 16-17; *see* 5 U.S.C. § 706(2)(A).

Defendants timely appealed. They also moved for a stay pending appeal, which a panel of this court denied.

Six of the seven seats on the Broadcasting Board remain empty.

**II.**

We have appellate jurisdiction to review the district court's entry of a permanent injunction. 28 U.S.C. § 1292(a)(1). We review *de novo* both the district court's jurisdiction to issue the injunction, *Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 928 F.3d 1102, 1108 (D.C. Cir. 2019), and its grant of summary judgment, *N.M. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 148 F.4th 755, 764 (D.C. Cir. 2025).

**A.**

Defendants first contend that the district court lacked jurisdiction over Abramowitz's claim. Congress, they assert, implicitly precluded the district court's federal-question jurisdiction by channeling Abramowitz's claim into the specialized administrative framework for personnel actions subject to the Civil Service Reform Act (CSRA), 5 U.S.C. §§ 1101 *et seq.* Appellants' Br. 22. We hold that the district court had jurisdiction over Abramowitz's suit.

Congress has empowered federal district courts to adjudicate civil actions "arising under" the Constitution and laws of the United States. *Royal Canin U. S. A., Inc. v.*

*Wullschleger*, 604 U.S. 22, 26 (2025) (quoting 28 U.S.C § 1331). That broad grant secures district court jurisdiction over "cases founded on federal law" except where Congress has withdrawn it. *Id.* Congress excepts suits from federal-question jurisdiction either "explicitly," by providing "that district court jurisdiction will yield," or "implicitly, by specifying a different method to resolve [the] claims," such as review by an administrative agency. *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 185 (2023).

We have long understood that Congress implicitly abridged the district court's federal-question authority when it enacted the CSRA. The CSRA provides "a comprehensive system for reviewing personnel action taken against federal employees." *United States v. Fausto*, 484 U.S. 439, 455 (1988). It channels almost all federal employment claims through the Merit Systems Protection Board (the MSPB) in lieu of suit in district court. *See Elgin v. Dep't of Treasury*, 567 U.S. 1, 12-13 (2012). Defendants contend that Abramowitz's claim belongs before the MSPB, so the district court lacked power to hear it. Abramowitz acknowledges that the CSRA provides the exclusive remedy for claims within its scope but argues that his claim to enforce the network-head removal statute—22 U.S.C. § 6205(e)—falls outside of the CSRA's ambit.

We thus consider whether Abramowitz's claims "are of the type Congress intended to be reviewed within [the] statutory structure" of the CSRA. *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212 (1994). "The ultimate question is how best to understand what Congress has done"—namely, whether Congress intended to preclude a district court from hearing a claim of the type before us. *Axon*, 598 U.S. at 186. We begin by taking "the 30,000-foot view" of Congress's statutory scheme. *Id.* at 189. We then evaluate the *Thunder*

*Basin* factors—three considerations that the Supreme Court has identified as typical indicia of congressional intent regarding whether to preclude district court review.

Viewed from "30,000 feet," this case is "not very hard." *Id.* at 188. Congress gave no hint that it intended the CSRA to channel a section 6205(e) claim like Abramowitz's to the MSPB for resolution. The CSRA's administrative scheme serves goals that are distinct from the goals of section 6205(e), and channeling to the MSPB would render section 6205(e) entirely ineffective.

The CSRA, enacted in 1978, was "designed to balance the legitimate interests of the various categories of federal employees with the needs of sound and efficient administration." *Fausto*, 484 U.S. at 445. It "establishes the principles of the merit system of employment" and "governs personnel actions based on unacceptable job performance" as well as "adverse action taken against employees for the 'efficiency of the service.'" *Id.* at 445-46 (citation omitted). It provides the mechanism for employees to vindicate their private interests in their employment, and it accounts for the government's interests as an employer in building a workforce of ability and integrity.

As relevant here, the CSRA channels employee appeals of covered actions to a specialized administrative agency, the MSPB. *See* 5 U.S.C. § 7543(d). And in most circumstances, the Federal Circuit has exclusive jurisdiction to review decisions of the MSPB. *See id.* § 7703(b)(1)(A). "Congress enacted the detailed CSRA review system to ensure greater uniformity of process and consistency of interpretation" in the government's disputes with its employees. *Fed. L. Enf't Officers Ass'n v. Ahuja*, 62 F.4th 551, 559 (D.C. Cir. 2023).

Section 6205(e) serves an entirely different purpose. Congress enacted section 6205 in 2021 as part of a package of reforms meant to secure the journalistic independence and efficacy of the networks under the umbrella of the Agency for Global Media. Those reforms strengthened the Broadcasting Board as an adviser and watchdog of the Agency CEO, *see* 22 U.S.C. § 6205(d), and gave the Broadcasting Board the final say over the appointments and removals of a handful of inferior officers, including the heads of Voice of America and five other congressionally established networks, *id.* § 6205(e)(1)-(2). Defendants have offered no evidence that Congress enacted section 6205(e) to serve the government's generic interests as an employer. Indeed, there is no dispute that section 6205(e) was designed to protect the nation's substantive policy in favor of objective reporting, reflecting our national interest in free media around the globe. It is not a standard employment law, but a durable barrier against any breach of the firewall protecting the journalistic integrity of Voice of America and the affiliate networks. As a matter of common sense, it is difficult to explain why Congress would treat a section 6205(e) claim as a federal employment matter appropriately channeled to the MSPB.

Applying the ordinary principles of federal-question jurisdiction allows a plaintiff alleging a violation of section 6205(e) to obtain immediate equitable relief in federal district court, vindicating Congress's design to preserve the networks' integrity. Channeling section 6205(e) claims through the CSRA, in contrast, would effectively nullify Congress's decision to make the Broadcasting Board the guardian of the independence of the networks' leadership. The CSRA offers no mechanism for keeping a network head in the job; the MSPB lacks power to award preliminary relief. *See* Oral Arg. at 17:58-18:14. And the CSRA's potential remedies of backpay or reinstatement for an individual employee cannot repair

harms to a network's reputation, reach, and reliability. Any remedy available through the CSRA would come too late to accomplish the purpose of section 6205. And no remedy under the CSRA could provide a network head with ongoing injunctive protection from a renewed attempt to effect an illegal removal.

Section 6205(e) evinces Congress's intent to advance the journalistic integrity of the Agency for Global Media networks. And, for the provision to have the effect Congress sought, the legal protections it established must be immediately and continuously enforceable—that is, they must fall outside the CSRA's ouster of federal-question jurisdiction. Thus, even were we to assume that agency action affecting Abramowitz's employment would otherwise be channeled under the CSRA, we would treat enactment of section 6205(e) as having restored federal-question jurisdiction over the type of claim at issue here. The Supreme Court has recognized that "a specific policy embodied in a later federal statute should control our construction of the [earlier] statute," even where the earlier statute "ha[s] not been expressly amended." *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000) (alterations in original) (citation omitted). Here, section 6205(e)'s policy empowering the Broadcasting Board to control a handful of appointments and removals guides our interpretation of the CSRA's exclusivity.

In response, defendants point to the Supreme Court's broad language describing the CSRA's exclusivity: "When a covered employee appeals a covered adverse action, the CSRA grants the MSPB jurisdiction over the appeal." *Elgin*, 567 U.S. at 20. But the Court has cautioned that "'general language in judicial opinions' does not control 'quite different circumstances that the Court was not then considering,'" nor does it "preclude Congress from enacting a later exception" to

a broad rule articulated by the Court. *Exxon Mobil Corp. v. Corporación Cimex, S. A.*, 609 U.S. 108, 128 (2026) (quoting *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 278 (2023)). We understand the Congress that enacted section 6205 to have intended it to fall outside the broad scope of CSRA preclusion.

We are especially wary of overreading the CSRA's preclusive scope given that the exclusivity of its administrative remedies is not expressly guaranteed. Because CSRA preclusion is only implicit, its scope is nowhere delineated in the statutory text. *See Elgin*, 567 U.S. at 12 (deeming it "fairly discernible" from the CSRA's comprehensive scheme "that Congress intended to deny . . . an additional avenue of review" to employees seeking review of adverse employment actions covered by the CSRA). "[I]t can be strongly presumed that Congress will specifically address language on the statute books that it wishes to change," but courts "frequently" find that Congress has made a "repeal by implication of a legal disposition implied by a statutory text." *Fausto*, 484 U.S. at 453. Even assuming that, under *Elgin*, we must start by presuming preclusion, we hold that Section 6205(e) is best read to effect an implicit exemption from CSRA's implied preclusion, restoring the default of federal-question jurisdiction for Abramowitz's suit.

We next consider the *Thunder Basin* factors as elucidated in *Axon*. Because Congress "rarely allows" government actions "to escape effective judicial review," the first factor is whether "precluding district court jurisdiction [would] 'foreclose all meaningful judicial review'" of a plaintiff's claim. *Axon*, 598 U.S. at 186 (quoting *Thunder Basin*, 510 U.S. at 212-13). Because Congress may wish "to give [an] agency a heightened role in the matters it customarily handles," the second factor is whether the claim filed in federal court is

central or "wholly collateral to [the] statute's [alternate] review provisions." *Id.* (quoting *Thunder Basin*, 510 U.S. at 212). And because Congress generally designs special review provisions to draw on an agency's "distinctive knowledge," the third factor is whether the claim falls within or "outside the agency's expertise." *Id.* (quoting *Thunder Basin*, 510 U.S. at 212). The factors need not all favor Abramowitz to support the district court's jurisdiction. *Id.* On balance, the *Thunder Basin* factors confirm our understanding of Congress's intent.

*First*, if CSRA preclusion applied, Abramowitz might be denied access to meaningful judicial review. The first factor has greatest relevance when a plaintiff loses all access to Article III courts—a highly unusual result. *Id.* at 186. Here, Abramowitz might eventually reach the Federal Circuit: Under the CSRA, he could obtain judicial review in the Federal Circuit if he lost his claim before the MSPB. *Elgin*, 567 U.S. at 21. But we have reason to question whether an agency review scheme satisfies the first factor if it "foreclose[s] all meaningful judicial review at the preliminary injunction stage" despite an irreparable harm. *See New York v. Trump*, 181 F.4th 132, 140 n.3 (D.C. Cir. 2026); *Axon*, 598 U.S. 175, 191 (explaining that judicial review "come[s] too late to be meaningful" if an injury is "impossible to remedy" by the time "appellate review kicks in"). The harm Abramowitz faces is an immediate one. And, as explained, the MSPB lacks power to enter preliminary relief. The threat of removal is "a powerful tool for control," *Edmond v. United States*, 520 U.S. 651, 664 (1997), and if defendants can remove Abramowitz for the lengthy duration of MSPB proceedings, they can effectively exercise control over Abramowitz and Voice of America that Congress by statute vested elsewhere.

*Second*, Abramowitz's claim is collateral to the CSRA's scheme. Unlike the typical aggrieved employee, Abramowitz

does not seek to reverse his termination on its merits. He instead argues that defendants failed to satisfy section 6205, which poses a procedural hurdle to Abramowitz's removal. Nowhere does Abramowitz call on the MSPB to "address the sorts of procedural [and] evidentiary matters [the] agency often resolves on the way to a merits decision." *Axon*, 598 U.S. at 193. Defendants presented Abramowitz with a Notice of Proposed Removal asserting insubordination, but its contents—the usual focal point for MSPB review—are irrelevant to Abramowitz's section 6205 claim. Rather than seeking "reinstatement, backpay, and attorney's fees"—"precisely the kinds of relief that the CSRA empowers the MSPB and the Federal Circuit to provide," *Elgin*, 567 U.S. at 22—Abramowitz seeks an injunction against unlawful interference with his head-of-network position.

*Third*, Abramowitz's suit plainly lies outside of the MSPB's substantive expertise. Agencies have no "distinctive knowledge" to apply to "[c]laims that tenure protections violate Article II." *Axon*, 598 U.S. at 186, 194. That is the sole merits issue in Abramowitz's suit. Since Abramowitz's claim is not "intertwined with or embedded in matters on which the [MSPB is] expert," *id.* at 195, we have no substantive reason to infer that Congress intended to channel his claim through the agency.

In sum, the *Thunder Basin* analysis confirms what the statute itself makes clear: that Congress had no reason to channel Abramowitz's claim through the CSRA, and every reason not to. Section 6205 evinces a special need for district court jurisdiction. Section 6205(e) is designed to safeguard the independence of the Agency for Global Media network heads by barring their removal in the absence of the Broadcasting Board's approval. That safeguard works only when it can be promptly enforced.

**B.**

On the merits, defendants concede that they removed Abramowitz in violation of section 6205(e). They offer a single defense: that the removal procedures in that section "violate Article II." Appellants' Br. 32. We conclude that section 6205(e) is constitutionally valid, so defendants' attempt to remove Abramowitz was contrary to law. 5 U.S.C. § 706(2)(A).

Article II provides that "Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2. By implication, Congress has power to vest removals in those same entities, since "the 'power of removal of executive officers' is 'incident to the power of appointment.'" *Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 763 (2025) (quoting *Myers v. United States*, 272 U.S. 52, 119 (1926)).

Abramowitz, the head of Voice of America, is "undisputedly an inferior officer." Appellants' Br. 32; Appellees' Br. 29. And the Broadcasting Board is undisputedly a department head. *See* Appellants' Br. 33 ("assuming the [] Board could be viewed as a department head" and providing no argument to the contrary); Appellees' Br. 29 ("Defendants do not challenge that the Board 'could be viewed as a department head'"); Reply Br. 10 (describing the Board as "an entity that might be described as a 'head' of a separate department"); *Abramowitz v. Lake*, No. 25-cv-887, 2025 WL 4632354, at *2 n.4 (D.D.C. Sept. 2, 2025) (concluding that any argument by defendants that the "Board does not qualify as a Head of Department . . . is doubly waived").

Congress thus has constitutional authority to vest power over Abramowitz's removal in the Broadcasting Board. That

is just what section 6205(e) does. The section creates two pathways for removal of a network head. First, "only" the approval of "a majority" of the Broadcasting Board can authorize the Agency CEO to appoint or remove a network head. 22 U.S.C. § 6205(e)(1). Second, without the CEO's initiative or agreement, "five or more members" of the Broadcasting Board "may unilaterally remove" a network head "[a]fter consulting with the [Agency CEO]." 22 U.S.C. § 6205(e)(2). Both pathways give the Board the final say in the removal.

Focusing on the first pathway, defendants object that Congress violated Article II by "[m]aking removal a joint concern" of the Broadcasting Board and the Agency CEO. Appellants' Br. 33. But the Supreme Court has consistently "found that the department head's approval satisfies the Appointments Clause" even where a statute assigns an initial or proposed decision to a different official. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 512 n.13 (2010). What is more, the Broadcasting Board can also remove Abramowitz on its own initiative through the second pathway. To employ that pathway, the Broadcasting Board need only "consult[] with" the Agency CEO, 22 U.S.C. § 6205(e)(2), who must meet with the Board on its "request," *id.* § 6205(d)(2). That pathway thus affords the Board comprehensive—not shared—statutory power over Abramowitz's removal.

Defendants next insist that the Appointments Clause requires Congress to vest control of inferior officers in the head of "the department that actually employs" the inferior officer—here, the Agency CEO. Reply Br. 14. The Supreme Court's decision in *Morrison v. Olson*, 487 U.S. 654 (1988), forecloses that argument. There, the Court sustained a statute creating a special Article III court "for the purpose of appointing independent counsels." *Id.* at 661 (quoting 28 U.S.C. § 49

(1982 ed., Supp. V)). The Court first concluded that an independent counsel so appointed was an inferior officer and then held that the Appointments Clause does not prohibit Congress from providing that an inferior "officer of one branch" shall be "appointed by officers of another branch." *Id.* at 673.

Section 6205 involves a more modest distance between employing and appointing body than did the provision for interbranch appointment sustained in *Morrison*. It falls comfortably within the constitutional power of Congress to "by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2. As the Court in *Morrison* underscored, the words "as they think proper" seem "clearly to give Congress significant discretion." 487 U.S. at 673. Here, instead of giving the federal judiciary power to appoint an executive-branch law-enforcement official, Congress gave the head of one executive agency the power to remove an officer in another executive agency. The heads of both agencies are removable at the President's will. Congress simply deems it "proper" to assign each a measure of authority over heads of network: The Agency CEO manages the heads of network on a day-to-day basis, while the Board has the final say on their removal.

Defendants lastly contend that section 6205 creates an unconstitutional "exception[] to the President's unrestricted removal power." Appellants' Br. 34 (citing *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 204 (2020)). In *Trump v. Slaughter*, 609 U.S. 422 (2026), the Supreme Court announced that "the President may remove his subordinates at will" from principal officer positions. *Id.* at 442. We need not consider here whether the same rule applies to inferior officers and employees because, regardless, section 6205 secures the

President's ability to remove Abramowitz for any or no reason—albeit more indirectly than defendants would like. The scheme parallels one that the Supreme Court approved in *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477 (2010). In *Free Enterprise Fund*, the Court explained that when a department head can "remove [an inferior officer] at any time," the department head is "fully responsible for what the [inferior officer] does." *Id.* at 495. The President can then "hold the [department head] to account for its supervision of the [inferior officer], to the same extent that he may hold the [department head] to account for everything else it does." *Id.* at 495-96. So long as the President has adequate control over the department head, and the department head can control the inferior officer (as is the case here), the President can transitively control the inferior officer. The department head's supervision "preserv[es] the chain of command in Article II." *Braidwood*, 606 U.S. at 754.

Section 6205's scheme maps neatly onto the outline the Supreme Court laid out in *Free Enterprise Fund*. Indeed, an important distinction serves to provide more presidential control under section 6205. In *Free Enterprise Fund*, the department head was the Securities and Exchange Commission, a multimember body whose commissioners each had for-cause removal protection. 561 U.S. at 487. Here, the parties have not disputed that the President can, consistent with *Slaughter*, remove members of the Broadcasting Board at will. 609 U.S. at 442. *Free Enterprise Fund* tells us that Abramowitz is as subject to Presidential oversight as the members of the Board that appoints and removes him. 561 U.S. at 509. Given that the Broadcasting Board is subject to at-will presidential removal, Abramowitz is effectively subject to the same.

Defendants complain that because the power to remove Abramowitz is "diffused" across a multimember body, he is effectively shielded from removal. Appellants' Br. 36. As a practical matter, it is true that the President might face delay if he had to fire and replace a majority of the Board to effectuate his removal decision. But that delay is attributable to the Appointments Clause itself, which requires that principal officers receive Senate confirmation and "contemplates collective appointments," including by "multimember bodies" that head departments. *Free Enter. Fund*, 561 U.S. at 512-13; *see* U.S. Const. art. II, § 2. The President retains the power to supervise the Broadcasting Board (and thus, the heads of network) consistent with the requirements of the Constitution.

**III.**

We conclude by considering remedy. Defendants assert that the district court lacked authority to enjoin them from removing Abramowitz without the Broadcasting Board's approval. That argument, too, is foreclosed by our precedent. We have long held that courts may enforce statutory "removal restrictions" through "injunctive relief against subordinate [executive] officials." *Swan v. Clinton*, 100 F.3d 973, 977-78 (D.C. Cir. 1996); *see Severino v. Biden*, 71 F.4th 1038, 1042-43 (D.C. Cir. 2023).

The Supreme Court's recent decision in *Trump v. Cook*, 609 U.S. 528 (2026), reinforces our precedent. There, the Court held that a district court "may order that a removed [official] remain in office during the pendency of litigation." *Id.* at 549. The availability of a permanent injunction then turns on whether any remedy at law, such as money damages, could adequately redress a plaintiff's injury. *See id.*; *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (setting out four-part test for permanent injunctions, including the absence

of an adequate remedy at law). Defendants contest the district court's power to enjoin Abramowitz's removal, but they point to nothing to counter his contention that no other form of relief would redress his injury. We accordingly have no basis on which to disturb the district court's determination that Abramowitz made the necessary showings to support a permanent injunction. *Abramowitz*, 803 F. Supp. 3d at 17-18.

**IV.**

For the foregoing reasons, we affirm the district court's order of August 28, 2025.

*So ordered.*